A jury found appellant guilty of the murder of Dollie Maude Owens. The court fixed his punishment at imprisonment for fifty years and sentenced him accordingly.
The badly decomposed body of the alleged victim was found on September 3, 1980, in some weeds and bushes near a school playground in Lafayette, Alabama. The coroner and other authorities took charge promptly. The body was not identified until skin from her fingers had been determined to be that of the alleged victim by means of fingerprint procedures that disclosed that fingerprints therefrom matched previously taken known fingerprints of Dollie Maude Owens, an apparently well known black female who resided in Lafayette. Able expert witnesses testified to bruises and gashes on her body, and, according to their opinion, she had died from strangulation some time between six days and three days prior to September 3. Upon the establishment of her identity, it was determined that she had been last seen at various places in Lafayette on Saturday afternoon and night August 30, 1980. There was evidence that she was seen with defendant about midnight of August 30-31, and that she had never been seen alive since that time.
The defendant did not testify, but a written incriminating statement signed by him was admitted in evidence, which revealed that he was drinking and going around with the victim about midnight of August 30-31, that they had an argument about some money and that he hit her with his fist. He said, "I hit her up around the front of her neck, and she fell and hit her head on the curb." According to the written statement, defendant then picked her up, "toted her down back of Southside School and laid her down back of the playground in some bushes."
Four of appellant's contentions are without merit, in our opinion. Neither the evidence nor any of the authorities cited by appellant supports any of his four numbered contentions as follows:
1. There was no proof of jurisdiction and venue.
3. There was no proof of the corpus delicti.
 4. There was no proof of the elements of the crime of murder.
 5. The "Chain of Custody of Evidence," referable to the state and condition of the body of the alleged victim from the time it was discovered until it was released by the authorities for preparation for burial, was not shown.
By appellant's only other contention for a reversal (Contention No. 2), he challenges the ruling of the court admitting in evidence, over defendant's objection, his written incriminating statement, saying that "the state has not met its burden of proving that the Defendant's statement was given freely, intelligently and voluntarily and was not a product of indirect coercion."
The penned statement, with the letters of each word thereof formed separately without joinder, is tantamount to a confession that he killed Dollie Maude Owens; it is not tantamount to a confession that he murdered her, that he killed her intentionally. However, the whole of the evidence, including the statement, was sufficient to present a jury issue as to defendant's guilt of murder.
As a preliminary to the introduction of the statement in evidence during the direct examination of Lafayette Chief of Police Mike Looser as a witness for the State, the following occurred:
 "Q. Did you have anything else to do in connection with this case? *Page 994 
"A. Yes, I did.
 "MR. GAVIN: [Counsel for the State]: May I approach the bench?
"THE COURT: Yes, sir.
 "(Thereupon there was a discussion at the bench between the Court and counsel)
 "THE COURT: Ladies and Gentlemen, there is a legal matter that I must take up at this time. This legal matter is not for your consideration, this is a question strictly for the Court and I must make a determination as to the legal issue. So I will ask you to step into the jury room and I will direct you that during this recess you will not discuss this case or any aspect of the case.
"If you would, step into the jury room.
 "(Thereupon the jury went into the jury room at 2:30 P.M. and the following occurred outside of their presence.)
"MR. GAVIN:
 "Q. Chief Looser, during your participation in the investigation of this case, did you have the occasion to take a statement from the defendant, Henry Swint?
"A. That's correct I did."
Thereupon, counsel for the State proved by the witness that he had advised the defendant "of his constitutional rights which we have on a card," which purportedly included the Miranda
rights, the rights set forth in Miranda v. Arizona,384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)." It was further shown by the testimony of the witness that no violence or threat of violence to defendant occurred, that defendant apparently understood his rights and that no offer of any kind was made to induce him to make a statement. The statement was then presented and read into the transcript, and counsel for the State said: "We move to admit that in evidence, Your Honor."
Immediately thereafter, cross-examination of the witness was commenced. It included the following:
 "Q. Now, you state that this was taken down at the Department of Public Safety, is that correct?
"A. That's right.
 "Q. Now, I assume that you and Mr. Swint didn't just meet down there, did you?
"A. No, sir, we did not.
"Q. He was taken down there?
"A. That is correct.
"Q. By whom?
 "A. By myself and Sgt. Willie Washington of the Lafayette Police Department.
"Q. For what purpose?
"A. For a polygraph test.
 "Q. Now, you state that you and Sgt. Washington took him down there?
"A. That is correct.
 "Q. Did you then deliver him into someone else's custody?
"A. Deliver him into someone else's custody? No sir.
 "Q. You weren't with him when the polygraph test was conducted, were you?
"A. No sir, no sir.
"Q. Who was he with?
 "A. He was with Sgt. Mac Cloud of ABI. Sgt. John M. Cloud. These polygraphs are —
"Q. — Have you seen —
"A. — sir?
"Q. When was the last time you saw Sgt. Cloud?
"A. I don't think I've seen him since that day.
"Q. Was there anyone else present?
"A. No sir.
 "Q. So you did deliver him to Sgt. Cloud, did you not?
 "A. I wouldn't say `delivered,' I carried him down there.
"Q. And then he was put into custody?
 "A. No sir, he was not put into custody of Sgt. Cloud.
"Q. Why do you make a distinction?
 "A. Because he wasn't under custody. He was down there on his own free will.
"Q. But, you make a distinction?
"A. Yes, sir.
 "Q. If you take a, say, handed me that piece of paper there you would deliver custody of it, of that paper, wouldn't you? *Page 995 
"MR. GAVIN: Judge . . .
 "A. — No sir, I wouldn't think so. I would hand you the piece of paper.
"Q. But custody would actually change hands.
 "MR. GAVIN: Judge, we object to this line of questioning.
 "THE COURT: I have a hard time seeing how it's connected. I sustain the objection.
"Q. But he went into the room with Sgt. Cloud?
"A. That's correct.
"Q. You, nor Sgt. Washington, went into the room?
"A. No sir.
 "Q. Do you have any knowledge as to what subjects (indiscernible) —
"A. — no sir.
 "Q. But when he came out of there he said he was going to give you a statement, didn't he?
"A. Sir?
 "Q. When he came out of that room he said that he was going to give you a statement?
"A. I asked him would he like to make a statement.
"Q. And he said, `Yes.'
"A. That is correct."
There soon intervened references to the polygraph test, as to which the witness did not participate, and the cross-examination continued as follows:
 "Q. Now, prior to that, did you and Sheriff Morgan ever have occasion to interrogate the defendant?
"A. No sir.
 "Q. Was there a time or occurrence when you or the sheriff were together with the defendant?
"A. No sir.
"Q. There was not?
 "A. Not to my knowledge. No sir. Sgt. Washington must have talked to the defendant. He advised he did not want to make a statement and we did not ask him another question.
"Q. When was this?
"A. It —
 "Q. — he stated that he did not want to make a statement?
"A. That is correct.
"Q. When was this?
"A. No way I can tell you that?
 "A. [Sic] Were you present when the defendant talked with Mr. Cook an attorney in this case?
"A. No sir.
"Q. You were not?
"A. No sir.
 "Q. Did the defendant state to you that he wanted a lawyer?
 "A. Yes sir. That is the exact reason I did not ask him another question.
"Q. Did you get him a lawyer?
 "A. Did I get him a lawyer? No sir, I didn't get him a lawyer.
"Q. Nobody got him a lawyer?
"A. It seems to me like the Court did. You are here.
 "Q. At that time which was prior to this statement he had asked for a lawyer?
 "A. That's what he said. He would not make a statement without a lawyer."
The jury was then returned to the courtroom, and the direct examination of the witness was resumed, in which he repeated in substance his testimony that he had given during the hearing out of the presence of the jury as to defendant's being apprised of his constitutional rights and that nothing was done or said to "induce or coerce him to make a statement." The witness produced a copy of the written statement and was asked to read it to the jury. The transcript shows the following objection and ruling of the court:
"MR. PHILLIPS. We renew our objection, Your Honor.
"THE COURT: Overrule your objection."
The statement was then read in its entirety, and the following occurred:
"MR. GAVIN: Will you mark this please.
 "(Thereupon the statement above referred to was marked State's Exhibit # 3 for identification purposes.) *Page 996 
 "MR. GAVIN: Your Honor, we offer to admit in evidence, State's Exhibit # 3.
"MR. PHILLIPS: Objection.
 "THE COURT: Overrule your objection. It will be admitted.
"MR. GAVIN: That's all we have.
"THE COURT: You may cross-examine."
The cross-examination was short and was devoted almost exclusively to a development of the point that the statement didn't "say anything about intending to kill her."
According to the undisputed evidence, when defendant was in custody and was first sought to be interrogated after being apprised of his "constitutional rights," he definitely made it known to the officers that he would not make a statement to them, without a lawyer, and that the written statement he thereafter gave, which was admitted in evidence over the objection of defendant, was not made until a colloquy as to whether he would make a statement had been initiated by the officer, or officers, to whom he made the statement. In our opinion, the obtainment of the statement under such circumstances runs afoul of what was held in Miranda v.Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), as supplemented by Edwards v. Arizona, 450 U.S. 477,101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The following from Edwards v.Arizona, at 101 S.Ct. 1884-1885, suffices, we think:
 ". . . [W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police."
To any contention that defendant did not strongly and sufficiently press objections to the introduction in evidence of defendant's incriminating statement, we suggest that perhaps there was some vacillation on his part as to whether, when taken alone, it helped defendant more than it hurt him, in its tendency to show that he did not intentionally kill the alleged victim. At any rate, his objections and the action of the court in overruling them were unequivocal.
By reason of the action of the court in overruling defendant's objections to the introduction in evidence of his incriminating statement, the judgment of the trial court should be reversed and the cause remanded for another trial.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
REVERSED AND REMANDED.
All the Judges concur.