The defendant was indicted for the capital offense of "rape when the victim is intentionally killed" in violation of Alabama Code Section 13A-5-31 (a)(3) (1975). A jury found him guilty of "the capital offense as charged in the indictment." A separate sentencing hearing was held and the jury fixed the defendant's punishment at death. The trial court then held a separate hearing as required by Alabama Code Sections 13A-5-32 and -33 (1975), adjudged the defendant guilty of the capital offense as charged in the indictment, and fixed his sentence at death. Three issues are argued on appeal.
 I
The defendant contends that his Fifth Amendment rights were violated when he was subjected to police questioning after requesting counsel. He argues that Edwards v. Arizona,451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), is controlling.Edwards followed the holding of Miranda v. Arizona,384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), that if the accused requests counsel, "the interrogation must cease until an attorney is present." Miranda, 384 U.S. at 474,86 S.Ct. at 1628.
 "(W)e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchange or conversations with the police." Edwards, 451 U.S. at 484-85, 101 S.Ct. at 1885.
The crime was committed sometime during the night of Monday, May the 26th or the early morning of May the 27th. The defendant and Ernest Jackson were taken into custody by Deputy Sheriff James Earl Smith a little after 9:00 A.M. on the 27th and transported from Alabama Wire Company, where they were employed, to the Jefferson County Sheriff's Office. The defendant was fully advised of his constitutional rights underMiranda v. Arizona, supra, and made a voluntary, knowing and intelligent waiver.
Sergeant Smith then asked the defendant "some questions about some of his personal history and he said he didn't want to talk to no one, wanted to talk to a lawyer." Smith asked, "In other words you don't want to talk to me any more, is that correct?" The defendant replied, "No" and Smith concluded the statement at 10:00 A.M. without asking any additional questions. The record indicates that defendant answered a few of Sergeant Smith's questions and then said, "Before I talk any more now I would like to talk to my lawyer, or either my mama or somebody, I'm run down at this place." After the defendant said this, Sergeant Smith asked him some "personal history questions" concerning his age, height, weight, name, address and phone number.
After the request for counsel, the defendant was not questioned about the murder. The interview began at 9:49 A.M. and ended at 10:00 A.M.
After the questioning stopped, the defendant was told that he was going to be placed in a lineup and that if he could not be identified he would be taken back to work. The defendant was not identified, was released from custody and was taken back to his place of work around noon.
On the way back to Alabama Wire Company, Jackson volunteered to take a polygraph test. The defendant also agreed to do the same. The next day, May 28th, *Page 1352 
Deputy Sheriff Fred House picked up the defendant and Jackson at the Alabama Wire Company and took them to the Sheriff's Office to take the polygraph. After the test, both the defendant and Jackson were taken back to the Wire Company. Deputy House testified that on the way back to the company, the defendant told him that "he would be willing to talk with me more if I wanted him to, and what time he would get off that evening and he would be home if I needed to talk to him more."
Deputies Smith and House talked with the defendant's parents around 4:00 that afternoon. During the conversation, the defendant arrived and remained present but was not questioned.
About two or three hours later that afternoon, Deputy House telephoned the defendant at home and told him he needed to talk to him. The defendant agreed to go to City Hall with Deputy House. There, the record shows, the defendant was repeatedly advised of his Miranda rights and made both an oral and a written waiver of his constitutional rights.
Roger Dale Beam, Chief of Police of Warrior, told the defendant that Frank Marie Harris had given a statement implicating the defendant, that Beam knew the defendant was involved and would prove it if it was the last thing he ever did. The Chief was in the same room with the defendant for no more than a minute and a half and made this statement as they "were passing".
Deputy House told the defendant that he was being arrested for rape and murder. After House informed the defendant of the evidence against him, including the statement given by Harris, the defendant confessed and admitted his participation in the crime. Before the defendant told his "side of the story", Deputy House asked him whom he wanted present during the interview and the defendant stated that he wanted House and Deputy Carl Johnson present. With these officers present, the defendant then admitted his involvement.
The substance and intent of Edwards were not violated. After the defendant requested counsel all questioning concerning the facts of the case ceased. The defendant's constitutional rights were not violated by the fact that Deputy Smith sought biographical information from the defendant after the defendant had requested counsel. Varner v. State, 418 So.2d 961, 962
(Ala.Cr.App. 1982). Miranda does not erect "an absolute per se
bar on any conversation with the accused by investigating officers after the former has requested counsel. It only inhibits investigative interrogation related to the specific crime itself." United States v. Grant, 549 F.2d 942, 946 (4th Cir.), cert. denied, 432 U.S. 908, 97 S.Ct. 2955,53 L.Ed.2d 1081 (1977).
After the defendant was not identified in a lineup, he was released from custody and remained free for more than twenty-four hours. Sometime during that time he indicated to the police that he would be willing to talk to them. This is just the opposite of the facts in Edwards where Edwards, after having requested to see counsel, was told that "he had" to talk to the police. This case is clearly distinguishable fromEdwards because of the critical facts that the defendant was released from custody after he requested counsel and that he expressed a complete willingness to talk with Deputy House.Swint v. State, 409 So.2d 992 (Ala.Cr.App. 1982); Warrick v.State, 409 So.2d 984 (Ala.Cr.App. 1982).
In this case we have both express and explicit oral and written waivers of Miranda. North Carolina v. Butler,441 U.S. 369, 375-76, 99 S.Ct. 1755, 1758-59, 60 L.Ed.2d 286 (1979) (Although a Miranda waiver must be made specifically, it need not be express but may be inferred from the circumstances).
Confrontation with a co-defendant's confession is not necessarily an unfair tactic or unlawfully coercive. Gibson v.State, 347 So.2d 576, 582 (Ala.Cr.App. 1977). That the defendant's statement was motivated *Page 1353 
by his feeling of revenge against Harris and induced by his desire to see Harris prosecuted for the murder and rape does not render his statement involuntary. Moore v. State,415 So.2d 1210, 1214 (Ala.Cr.App. 1981); Oliver v. State, 399 So.2d 941,945 (Ala.Cr.App. 1981).
Clearly, a confession induced by a threat that the accused will be prosecuted unless he confesses will render any statement or confession involuntary and inadmissible in evidence. Hinshaw v. State, 398 So.2d 762 (Ala.Cr.App.), cert. denied, 398 So.2d 766 (Ala. 1981). We do not consider Chief Beam's statement that he would prove that the defendant "did it" as a threat in order to get the defendant to confess. We find no express or implied threat in Chief Beam's statement that the defendant would be prosecuted unless he confessed.
Threatening the defendant with prosecution if he does not confess is not the same as confronting an accused with evidence of his guilt. From the record, it appears that the law enforcement officers were totally candid in their dealings with the defendant. The statements made and the attending circumstances were not calculated to delude the defendant as to his true position, or exert improper and undue influence over his mind. There was no fraud, trickery, or subterfuge employed. 99 A.L.R.2d 772 (1965). The record supports no inference of pretense, artifice or deception. To the contrary, the record shows that the law enforcement officers were honest and straightforward in confronting the defendant with the case they had against him.
We have thoroughly reviewed the totality of the circumstances surrounding both statements given by the defendant, including the facts that he was nineteen years old and almost illiterate. Our assessment of these facts convinces us that both statements were completely voluntarily given after a knowing and intelligent waiver of constitutional rights.
 II
We cannot accept the defendant's contention that the corpus delicti of the capital offense charged in the indictment was not proven because the State failed to prove rape or attempted rape.
It is true, as the defendant argues, that there was no physical evidence of rape presented. Because of the quantity of blood present, tests of the victim's body cavities did not reveal the presence of seminal fluid. However, the circumstantial evidence affords satisfactory proof of the corpus delicti. A small area on the front of the defendant's undershorts was stained with human blood.
Michael Beckham was with the defendant and Frank Harris on the afternoon of May 26th. He heard the defendant tell Harris, "I'm going to get some pussy from a white lady" and Harris responded, "Yeah, I'm with you Horace." At the defendant's request, Beckham purchased the tape that was later used to bind the victim's wrists.
The victim was found tied to a tree with sixty-six stab wounds "over multiple body surfaces, including the chest, the abdomen, the upper legs, both back and front, and also in the personal region." The victim was naked except for a nightgown or negligee which was wrapped over her head.
In addition to a stab wound which penetrated the vaginal vault, there were lacerations of the vagina. Jay Glass, Chief Medical Investigator of the Office of the Coroner — Medical Examiner of Jefferson County, testified that lacerations mean "a tearing injury, tearing of tissue." There were also lacerations of the rectum.
What this Court said in Watters v. State, 369 So.2d 1262
(Ala.Cr.App. 1978), reversed on other grounds, 369 So.2d 1272
(Ala. 1979), another capital case, applies here. There the appellant argued that the only evidence of any attempted robbery in a prosecution for attempted robbery when the victim is intentionally killed was supplied by the confession, and that there was no independent, *Page 1354 
probative evidence to corroborate the confession. We held:
 "It is a settled principle of law that a mere extrajudicial confession, uncorroborated by other facts, is insufficient to show the corpus delicti and cannot support a conviction. Matthews v. State, 55 Ala. 187, 28 Am.Rep. 698 (1876); Reynolds v. State, Ala.Cr.App., 346 So.2d 979, cert. denied, Ala., 346 So.2d 986 (1977). However, it is equally as settled that inconclusive facts and circumstances tending prima facie to show the corpus delicti may be aided by the admissions or confession of the accused so as to satisfy the jury beyond a reasonable doubt, and so to support a conviction, although such facts and circumstances, standing alone, would not thus satisfy the jury of the existence of the corpus delicti. Hill v. State, 207 Ala. 444, 93 So. 460 (1922); Bryant v. State, 33 Ala. App. 346, 33 So.2d 402 (1948).
 "Circumstantial evidence may afford satisfactory proof of the corpus delicti. The presentation of facts, from which the jury may reasonably infer that the crime charged was committed, requires the submission of such question to the jury. Johnson v. State, 247 Ala. 271, 24 So.2d 17 (1946); Taylor v. State, 276 Ala. 232, 160 So.2d 641 (1964). Reasonable inferences may furnish a basis for proof beyond a reasonable doubt. Royals v. State, 36 Ala. App. 11, 56 So.2d 363, cert. denied, 256 Ala. 390, 56 So.2d 368
(1952).
 "The facts in this case and the legal inferences springing from them fully support and corroborate the appellant's confession. The evidence is therefore sufficient to support a conviction." Watters, 369 So.2d at 1271-72.
Under those principles set forth in Dolvin v. State,391 So.2d 133 (Ala. 1979), and Cumbo v. State, 368 So.2d 871
(Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979), there was evidence from which the jury might reasonably conclude that the evidence and all reasonable inferences therefrom excluded every reasonable hypothesis other than guilt and proof of the corpus delicti of rape.
The corpus delicti of a crime need not be shown by evidence "wholly independent of the relation of the accused to the offense charged. The evidence that defendant committed the crime may be so inextricably blended with proof of the corpus delicti as to make a separation impossible." DeSilvey v. State,245 Ala. 163, 165, 16 So.2d 183 (1944).
Any error in the failure to prove the corpus delicti prior to the introduction of a confession is cured by subsequent proof of the corpus delicti. Phillips v. State, 248 Ala. 510, 517,28 So.2d 542 (1946); Cooley v. State, 233 Ala. 407, 409,171 So. 725 (1937).
 III
Prospective juror Mencer was properly excluded for cause because she made it unmistakably clear that she would automatically vote against the death penalty regardless of the evidence. Ms. Mencer was questioned by the State, the defendant and the trial court. She repeatedly and consistently made it clear that she would automatically vote against the death penalty in favor of life imprisonment without parole regardless of the evidence because "to die would be the easy way out."
 "I feel that anybody who commits a crime should be punished even if it's my son, and I only have the one. However, I do not feel that death is the answer. I feel that if I take a life, an eye for an eye is not the answer. I feel that I need to know the feeling. I need to feel it. And the only way I can feel it is to live, eventually live, with my conscience, live with the thought that I have committed this act or this crime. So that I feel to suffer behind bars is a much greater punishment than death. I look at death as being the same as being asleep. And when I'm asleep, I don't know anything about what I've done. I mean I'm at *Page 1355 
peace — let me say it that way — I'm at peace. But if I have to face day in and day out behind bars and I know that I'm not going to be paroled, or the other person, I feel that's worse than dying."
* * * * * *
 "Under no circumstances would I want them to get out that lightly (with life without parole). And that's what I'm saying. I feel that if they have committed a crime, then they should not die, because that is too easy."
Under questioning by the trial judge, Ms. Mencer indicated unequivocally and positively that even if convinced beyond a reasonable doubt and to a moral certainty of the defendant's guilt she could not fix punishment at death and she could not conceive in her own mind of any circumstance, even if convinced of the defendant's guilt, where she would fix punishment at death if that were one of the available or alternative punishments.
Witherspoon v. Illinois, 391 U.S. 510, 522-23, 88 S.Ct. 1770,1777-78, 20 L.Ed.2d 776 (1968), made it clear that a prospective juror may properly be excluded for cause where he "would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case." (Emphasis in original). See also Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521,65 L.Ed.2d 581 (1980); Annot., 39 A.L.R.3d 550 (1971). Witherspoon
does not compel any inquiry into the subjective reasons why a prospective juror is irrevocably committed to vote against the death penalty. Such an inquiry is, in fact, irrelevant to the very purpose of Witherspoon, which is to produce a fair and impartial jury.
 "The right under the Sixth and Fourteenth Amendments to trial by a jury guarantees to the criminally accused `a fair trial by a panel of impartial, "indifferent" jurors.' Irvin v. Dowd, supra, 366 U.S. at 722, 81 S.Ct. at 1642. Accord, e.g., Murphy v. Florida, 421 U.S. 794, 799, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975). But the state also enjoys the right to an impartial jury, Williams v. Wainwright, supra, 427 F.2d at 923, and impartiality requires not only freedom from jury bias against the accused and for the prosecution, but freedom from jury bias for the accused and against the prosecution. Hayes v. Missouri, 120 U.S. 68, 70-71, 7 S.Ct. 350, 351, 30 L.Ed. 578 (1887). See Comment, 21 Vand.L.Rev. 864, 865 (1968)."
 Spinkellink v. Wainwright, 578 F.2d 582, 596 (5th Cir. 1978).
"Coexisting with the petitioner's right to an impartial jury, after all, is the State's right to have a jury that is willing to consider all the penalties prescribed by law." Williams v.Maggio, 679 F.2d 381, 385 (5th Cir. 1982).
 "All veniremen are potentially biased. The process of voir dire is designed to cull from the venire persons who demonstrate that they cannot be fair to either
side of the case. Clearly, the extremes must be eliminated — i.e., those who, in spite of the evidence, would automatically vote to convict or impose the death penalty or automatically vote to acquit or impose a life sentence. The guarantee of impartiality cannot mean that the state has a right to present its case to the jury most likely to return a verdict of guilt, nor can it mean that the accused has a right to present his case to the jury most
likely to acquit. But the converse is also true. The guarantee cannot mean that the state must present its case to the jury least likely to convict or impose the death penalty, nor that the defense must present its case to the jury least likely to find him innocent or vote for life imprisonment."
 Smith v. Balkcom, 660 F.2d 573, 578-79 (5th Cir. 1981) (emphasis in original), modified on unrelated point, 671 F.2d 858 (5th Cir. 1982).
Here, Ms. Mencer indicated that she was unwilling to consider all of the penalties *Page 1356 
provided by state law, and that she was irrevocably committed, before the trial began, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings and even if convinced of the defendant's guilt of the crime charged beyond any reasonable doubt and to a moral certainty. Therefore, she was properly excused for cause. This is exactly what Witherspoon requires.391 U.S. at 522, n. 21, 88 S.Ct. at 1777, n. 21.
 IV
As required, Beck v. State, 396 So.2d 645, 664 (Ala. 1981), this Court has examined this particular death sentence in light of the standards and procedure approved in Gregg v. Georgia,428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). The defendant was indicted and convicted for a crime that is, in fact, properly punishable by death. We take judicial knowledge that similar crimes throughout the state are being punished capitally. The defendant's accomplice, Frank Marie Harris, pled guilty and received life imprisonment.
The trial judge specifically found, and we agree, that the death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. The evidence overwhelmingly supports the finding of the statutory aggravating circumstance that the capital offense was especially heinous, atrocious, or cruel. Kyzer v. State,399 So.2d 330, 333-34 (Ala. 1981); Alabama Code Section 13A-5-35 (8) (1975). The trial judge specifically found (and all the evidence supports that finding) that the victim "was alive at the time she was stabbed sixty-six times." The aggravating circumstances (Sections 13A-5-35 (4) and (8)) far outweigh the mitigating circumstances (the defendant's age (19)) and the fact that he had no significant history of prior criminal activity.[1]
Because the aggravating circumstances remarkably and exceedingly outweigh the mitigating circumstances, this Court concurs in and affirms the findings of the jury and the trial court that death is the appropriate sentence. Indeed, applying the laws of this state and nation to the particular facts of this case, we do not see how any other penalty is justified. The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
[1] The defendant had been previously charged with rape in an unrelated case, but was acquitted. The trial judge, properly, did not consider that charge to negate the Section 13A-5-31 (a)(1) mitigating circumstance. See Cook v. State,369 So.2d 1251, 1257 (Ala. 1979).