The appellant, Wallace Norrell Thomas, appeals the trial court's denial of his petition for writ of error coram nobis wherein he contests the validity of his 1982 conviction for capital murder, pursuant to prosecution under § 13-11-2(a)(2), Code of Alabama 1975, and his resulting sentence of death by electrocution.
The offense for which Thomas was eventually convicted was committed on December 20, 1976. In 1977, Thomas was first tried, convicted, and sentenced to death. However, this conviction and death sentence were reversed, and the cause was remanded for a new trial, pursuant to Beck v. Alabama,447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), and Beck v. State,396 So.2d 645 (Ala. 1980). Thomas v. State, 400 So.2d 435
(Ala.Cr.App.), cert. denied, 400 So.2d 435 (Ala. 1981). On retrial in May 1982, Thomas was again found guilty, and the jury recommended imposition of the death penalty. Thereafter, the trial court sentenced appellant to death upon its finding that the sole mitigating circumstance, that Thomas has no significant history of prior criminal activity, was "far outweigh[ed]" by the two aggravating circumstances, (1) that the capital offense was committed while Thomas was engaged in the commission of a robbery and (2) that the capital offense was especially heinous, atrocious, or cruel. This conviction and sentence were affirmed by this court and our supreme court.Thomas v. State, 460 So.2d 207 (Ala.Cr.App. 1983), aff'd,460 So.2d 216 (Ala. 1984).
This court detailed the facts of the capital offense at length in Thomas v. State, 460 So.2d at 209-11, and we reiterate them here only to the extent that they are necessary *Page 250 
for our disposal of the issues raised on appeal. At approximately 6:30 on the evening of December 20, 1976, Miss Quenette Shehane left her fiance's residence at Birmingham-Southern College to go to a store nearby. On that same afternoon, in an apartment located across the street from Birmingham-Southern, John Mays, Jerry Jones, Eddie Bernard Neal, and appellant discussed "going out and pick[ing] up some young girls." All but Mays then left. Later, after Mays left his apartment and was walking by the "U-Tot-Em," he observed the following: A man pushed a young woman, who was struggling, into a car; this car left; and a car like Jones's car followed. At approximately 9:30 that evening, a friend picked up appellant, Neal, and Jones at a store located about one-half mile from where Miss Shehane's car was eventually found. Jones and Neal had blood stains, some heavy, on their clothes, in the chest area; there was no blood on appellant.
The following morning, Miss Shehane's nude and bullet-riddled body was found in an isolated area. Her body had numerous abrasions; three bullet wounds to the buttocks area; four bullet wounds to the left elbow; and one bullet wound, inflicted at close range, to the left chest. Her car was discovered three and one-half miles from the location of her body. Appellant's right palm print was lifted from the outside of the window of the right rear door. On the center section of the front seat was a stain, which by analysis, was determined to be human semen. On the victim's coat was a dark brown Negro pubic hair. Human blood was found on the car's right rear fender.
Appellant was arrested on January 28, 1977. A pistol which he had dropped in the presence of the officers was recovered. The pistol's serial number had been filed off. A comparison of bullets fired from this weapon with the four recovered from Miss Shehane's body and the one found in Miss Shehane's car revealed that the latter five bullets had been fired from the same gun which had been in appellant's possession.
Finally, after his arrest, appellant called his roommate and instructed him to dispose of a television which was in appellant's apartment and which had been seen in appellant's possession prior to Christmas. It was later determined that this same television had been in Miss Shehane's car when she was abducted, robbed, and murdered.
 I
Thomas first contends that the trial court erroneously denied his petition as to the specific ground that his trial counsel, the Honorable Al Hultquist, rendered ineffective assistance by failing to utilize a May 1977 report by Herbert W. Eber, Ph.D., a licensed psychologist.[1] In this report, Eber had the following data upon which to base his conclusions: Conclusory information "prepared by an automated method which had no awareness of the circumstances" and Eber's knowledge of Thomas's circumstances which are that Thomas was tested in the county jail and that Thomas's attorney informed him that Thomas was charged with a capital offense. Eber synthesized this information, in part, as follows:
 "There is no question whatever that this client is psychotic within the meaning of that term in mental health. He is a grossly disturbed person whose mental illness and additional disturbance interfere extremely with his functioning. His judgment is impaired, his reality contact is extremely poor, his depression is extreme, and his self destructive impulses are also severe and thus constitute a massive danger to himself. Motivational patterns are grossly confused, and from a treatment standpoint, this would be seen as a person who is desperately in need of psychiatric treatment. . . .
 "The legal issues of insanity are somewhat different, since more rigid standards *Page 251 
are applied. It is my opinion, however, that this man's condition warrants the legal definition of insanity and incompetence in terms at least of his present status. While he is clearly of sufficient intelligence to understand the nature of charges and the nature of his actions, he is equally clearly grossly psychotic, grossly out of contact with reality, and thus not able to exercise anything approaching normal judgment and discretion in the management of his own affairs. I would not consider him competent to assist the attorney in his own defense.
 "Since the data we have were not obtained at the time of the alleged crime, any judgment about the client's mental status at that time must be an inference based upon our knowledge of progression of such disorders. Assuming that, at the time of the alleged crime, the man was not undergoing active psychiatric treatment which has since been terminated, it is my judgment that he was at the time of the alleged crime, in essentially the same condition that is shown in the present data. That would in turn imply that he was then insane and incompetent within my understanding of the legal meaning of those terms."
Thomas summarized his argument of counsel's ineffectiveness, as follows: "Petitioner contends that the failure to properly investigate the Eber report, and failure to use the report or to have Dr. Eber testify, at least in the sentence hearing or the aggravation and mitigation hearing before the judge constituted ineffective assistance of counsel." (Brief, p. 32.)
In addressing Thomas's argument, we first note that Eber's conclusions are basically in direct conflict with the following findings of Dr. B.E. Blankenship and Donna C. Click, a psychiatric social worker, who evaluated Thomas on June 24, 1977: "There is no evidence of psychiatric illness. He appears to be a sociopath and is competent to stand trial." Eber's conclusions also contradict the findings of a psychological and psychiatric evaluation by the staff of Searcy Hospital at the request of the trial court for its consideration of sentencing in Thomas's first trial. (The report, dated December 15, 1977, notes that Thomas was admitted to Searcy Hospital on November 28, 1977.) This "evaluation included physical examination, mental status examination, psychological examination, social history study, neurological evaluation and psychiatric evaluation." After psychological examination, the following conclusions were made:
 "Mr. Thomas is an active, aggressive young man with average intellectual and ego resources. There is no indications of organicity, thought disorder or psychosis. Overall profile is that of a shrewd and resourceful individual who displays several features of antisocial personality."
After "[c]omprehensive psychiatric evaluation [which] included at least five psychiatric interviews during different days," the staff concluded that Thomas
 "demonstrates a high potential for violence with very little feeling of remorse, guilt, or regard for the distress or plight of other persons. It was the opinion of the examinating [sic] psychiatrist that Wallace Norrell Thomas is sane and competent, knows the difference between right and wrong and is able to cooperate and communicate with legal counsel in any type of legal proceeding. His diagnosis was given as Antisocial personality, severe."
In our evaluation of counsel's failure to utilize the Eber report or Eber's testimony in any phase of the proceedings, we adopt the findings of the trial judge (who also presided over Thomas's trial). We consider these findings to be supported by the exhibits introduced and the testimony taken at the hearing on Thomas's petition. We have added our own independent findings where appropriate:
"The following are taken as facts concerning Al Hultquist's representation as a whole:
"(1) Petitioner Thomas was represented at trial by Al Hultquist, who was assisted in jury selection by Al Pennington. Both are experienced and capable criminal defense *Page 252 
attorneys. At the time of Petitioner's trial, Hultquist had over six years experience in criminal law and had represented defendants in 50 to 100 felony trials. In addition, as an Assistant District Attorney, Hultquist prosecuted hundreds of felony cases. Pennington had eight years experience in criminal law and approximately 75 percent of his practice has been criminal defense work. He has personally tried over a hundred felony trials and several capital cases. Hultquist met with Pennington before Petitioner's trial and Pennington assisted Hultquist in striking the jury. During the course of the trial, the two attorneys would meet and discuss the testimony that had been given at trial and that which was anticipated.
"(2) Hultquist was appointed to represent Petitioner after Petitioner's first trial and capital conviction was reversed and remanded pursuant to Beck v. State, 396 So.2d 645 (Ala. 1980).
"In preparation for Petitioner's second trial, Hultquist had available to him the records and files of attorneys John Carroll and Mike McCormick, who represented Petitioner at his first trial. Hultquist met and discussed the first trial with McCormick, to the point of going over documents, such as the Eber report, which were available for use as evidence for both trials. Hultquist outlined the testimony of each of the witnesses at the first trial in preparation for the second trial. In addition, Hultquist attended the retrial of co-defendant Jerry Jones and reviewed the complete transcript of co-defendant Eddie Bernard Neal's trial. Hultquist also reviewed the transcript of Petitioner's first trial and the appeal materials.
"(3) After reviewing all the available materials, Hultquist met with Petitioner prior to his second trial. In fact, Hultquist secured permission and had Petitioner taken from the Holman Unit to Birmingham where he could discuss the case with Petitioner in an environment that might be more conducive to trial preparation. Hultquist discussed the case with Petitioner, and explained to him that the only direct physical evidence, in his opinion, that linked him to the victim was his palm print on the outside of the victim's car window. Hultquist talked with Petitioner about how he could testify at trial and still not incriminate himself, but Hultquist explained to him that he would be subject to cross-examination if he did take the stand to testify. Hultquist went through the outline he had prepared of each of the witnesses that testified at the first trial and Petitioner was very helpful in Hultquist's preparation for the witnesses that would be called to testify again.
"(4) Petitioner gave Hultquist his version of what happened the night of the robbery/murder. Petitioner said that he, Jones and Neal met and went out to pick up some girls from Birmingham-Southern College. One of the co-defendants had a car and they drove to a convenience store and picked up a girl. They then drove her out to a deserted road, then shot and killed her. Afterwards, they took some items out of her car. This account mirrors the statement made by Jerry Jones that Hultquist had already seen. Petitioner told Hultquist that he would not testify and incriminate Jones and Neal for the robbery/murder as they had done to him.
"(5) Prior to the trial Hultquist reviewed documents that related to Petitioner's psychological condition. He reviewed the Lunacy Commission report (State's Exhibit 2), and the Eber report (Defense Exhibit E). Hultquist also talked with Donna Click, a psychiatric social worker at the Jefferson County Jail, about the competency examination that was administered to Petitioner after he was first arrested. Hultquist talked with McCormick specifically about why the Eber report had not been introduced or utilized at all at Petitioner's first trial.
"(6) Hultquist decided, based on his thorough investigation of the case, including his conversations with Petitioner, that the only feasible defense available to Petitioner was to insist that the State be held to its burden of proving beyond a reasonable doubt the guilt of the Defendant, which would require that the jury believe that Petitioner was directly involved in the commission of the robbery/murder of Quenette *Page 253 
Shehane. Hultquist's strategy was to show that there was no physical evidence to connect Petitioner to the capital offense. Also, Hultquist would stress that the underlying robbery was not a component of the capital offense[, that it was not contemporaneous with the murder].
"A. ALLEGED FAILURE TO USE PSYCHOLOGICAL REPORT
"As to this specific claim, the following is taken as fact:
"(1) In paragraphs 13-26 of his Petition, Petitioner claims that his trial counsel was ineffective because he did not introduce into evidence a psychological report prepared by Herbert W. Eber. In support of this claim, Petitioner introduced the report into evidence. (Defense Exhibit E). Respondent presented the testimony of Hultquist and Pennington.
"(2) Hultquist examined and reviewed the Eber report prior to trial. Hultquist discussed with Mike McCormick [and his partner Jim Hard] the reasons why the report was not introduced at Petitioner's first trial. McCormick told Hultquist that the Eber report was not reliable and that Eber had a reputation of saying what he was paid to say. [Pennington, with whom Hultquist also conferred about the Eber report, expressed in his testimony this same view of Eber's reputation.]
"(3) Hultquist also had two contrary psychological reports to consider as well as his conversations with Donna Click. The report of the Lunacy Commission (State's Exhibit 2) and the Blankenship letter (State's Exhibit 1) reached conclusions inconsistent with the Eber report. Hultquist knew that the prosecution had the two contrary reports available and anticipated that the State would introduce them or call the examining psychiatrists if the defense presented the Eber report.
"(4) Hultquist was familiar with the use of the insanity defense in felony cases. It has been his experience that it was rarely, if ever, successfully utilized. Hultquist knew of cases where the insanity defense had actually worked to the detriment of a defendant. Hultquist had talked with Donna Click about her evaluation of Petitioner, which did not support insanity or psychiatric mitigation. He knew of other cases where she had recommended use of an insanity defense. In addition, Hultquist had read Zisken's text, 'Coping with Psychological Testimony'.
Another factor Hultquist considered was the fact that Eber had not personally examined Petitioner before releasing his psychological report, unlike the other two reports which were based on actual examinations of Petitioner. Hultquist knew that if the Eber report was introduced then the two contrary reports would be raised and in all likelihood help convince the jury that his client needed to be executed.
"(5) An examination of the Eber report reveals that it consists of two parts. The first part reaches a conclusion based on mechanically graded responses to set questions answered by the client. This portion was prepared by an automated method which did not consider other circumstances faced by the client, specifically that the client was charged with a capital offense. The second part of the report is purportedly based on a synthesis of the information used in the first part and Eber's knowledge of Petitioner's circumstances. The report itself is self-contradictory, in that the first and second parts of the report draw opposite conclusions as to Petitioner's mental and psychological condition. The report is internally inconsistent and would not have been persuasive if it had been introduced into evidence at Petitioner's trial. The Eber report, after review by this Court, is both self-contradictory and internally inconsistent and does not accurately reflect Petitioner's mental or psychological condition. [Hultquist testified that, upon his comparison of the Eber report and the Searcy report, he noted that, to a certain point, the reports are identical and draw the same conclusions; but the Eber report, upon continuation, draws conclusions which McCormick and he did not consider to be consistent with the test results.]
"(6) By not presenting the Eber report during the punishment stage of Petitioner's trial, Hultquist also avoided producing evidence *Page 254 
of his own client's dangerousness. The implication was clear from the report that Petitioner was a dangerous man and the jury might have been more likely to sentence a dangerous man to death.
"(7) Hultquist discussed the feasibility of using the Eber report as mitigation with Pennington, but decided that the report was more likely to frighten the jury than evoke any sympathy for Petitioner. [Pennington testified that he also viewed the report as having a tendency to prejudice and frighten the jury and that, because of its ambiguity and lack of concrete proof, the report would have had no effect on the trial court's sentencing. He considered the report to have 'a lot of gaps' and its conclusions to be unsupported.] Pennington was familiar with the rate of success of the insanity defense in Mobile County cases. He testified at the hearing he had never seen or even heard of insanity defense being successful, and that it was rarely, if ever, utilized in Mobile County cases.
"(8) Eber's report and its conclusions were contrary to Hultquist's knowledge of Petitioner's mental condition. Petitioner assisted Hultquist in preparation for trial and displayed a total understanding of the facts of the case. At trial, Petitioner suggested questions for Hultquist to ask witnesses, wrote notes dealing with specific facts and was very involved in his own case. [In fact, a review of the trial transcript reveals that the court granted Petitioner's motion to act as his own attorney, as co-counsel. At the hearing on the petition, Hultquist explained that Petitioner did not appear to have any mental problems.]
"(9) Eber's report is contrary to Petitioner's demeanor both at his trial and at his coram nobis hearing. At the coram nobis hearing, Petitioner expressed an excellent recall of events in this case and even corrected District Attorney Barber's recall of specific dates.
"(10) Further, Petitioner's mental competency is illustrated by his attempt to avoid culpability by minimizing his role in Quenette Shehane's murder. At his coram nobis hearing Petitioner gave a new version of the robbery/murder. Petitioner stated that Jerry Jones came to his apartment and asked if he wanted to go to a party. Jones then went to Neal's apartment and asked if he wanted to go along. Petitioner went downstairs and Quenette Shehane was in her car waiting for the three of them. Petitioner testified that he had seen Jones and Quenette Shehane together on prior occasions and that the two of them had been having a 'secret affair for eight to nine months.' All four together got in her car and drove to a house somewhere in north Birmingham. Petitioner did not know whose house it was, and did not know the names of any of the people at the party either. After 30 to 45 minutes, Jones and Quenette Shehane went outside. Petitioner and Neal went out on the porch later and heard gunshots. A couple of people from the party went with Petitioner and Neal to see what happened. They found Jones, who told Petitioner and Neal to jump in the car. Quenette was not in sight as the three men drove away in her car. In a panicky state, Jones drove toward Daniel Payne College and would not respond to Petitioner's queries about what had happened. Jones finally stopped and parked the car in a wooded area near the college, then the three of them walked several blocks to a pay phone to call someone to pick them up. Petitioner testified that he was not aware that Quenette Shehane had been shot and did not see her again after she walked out of the party with Jones. Petitioner stated that he saw blood on Jones and Neal got blood on himself when he grabbed Jones. Two or three days later as Jones was going home he asked Petitioner to keep some things for him while he was away. Among the items Jones brought Petitioner was a television set later established to have been taken from Quenette Shehane's car. [Petitioner contends that he told this version to Hultquist; Hultquist claims the contrary.]
"(11) Petitioner's testimony is blatantly false and totally without credibility. It is contradicted by the evidence at trial and the coram nobis hearing, including the testimony of Hultquist that Petitioner told him a version of the robbery/murder similar to Jones'. It is apparent that Petitioner's *Page 255 
testimony at the coram nobis hearing was calculated to evade criminal responsibility for the brutal robbery/murder of Quenette Shehane. His story, while false, does show that he is not suffering from any mental impairment."
We supplement the above facts with the following: Thomas testified, that in their "extensive conversations," he and Hultquist did not discuss the possibility of using a plea of insanity in defense or in mitigation and that he did not know of the existence of the Eber report. However, Hultquist testified that he discussed with Thomas the possibility of using Eber's testimony and report, but they concluded that, in view of their theory that Thomas did not participate in the robbery/murder, an insanity defense would be contradictory. Finally, we note the stipulation entered on the record to the effect that Eber's report reflects what his testimony would have been had he been called to testify.
In reviewing Thomas's claim that he was denied effective assistance of counsel during his second trial and sentencing, we turn to the principles of Strickland v. Washington,466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), wherein the Court established a two-prong test for determining the validity of a claim of ineffective counsel: The defendant must show both that his counsel's performance "fell below an objective standard of reasonableness," id. at 688, 104 S.Ct. at 2065, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct. at 2068. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id. at 687, 104 S.Ct. at 2064.
In determining whether a defendant has established his burden of showing that his counsel was ineffective, we are not required to address both considerations of the Strickland v.Washington test if the defendant makes an insufficient showing on one of the prongs. Id. at 697, 104 S.Ct. at 2069. In fact, the Court explained that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id. We defer to this guidance and address the "prejudice" prong, for "[w]ith respect to the prejudice component, the lack of merit of [Thomas's] claim is even more stark." Id. at 699, 104 S.Ct. at 2070.[2]
In assessing the possible prejudice arising from counsel's failure to use Eber's testimony or his report, we adhere to the following directives:
 "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer — including an appellate court, to the extent it independently reweighs the evidence — would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.
 "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected *Page 256 
by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. "
Id. at 695-96, 104 S.Ct. at 2068-69. The Court defined "reasonable probability" as "a probability sufficient to undermine confidence in the outcome," id. at 694,104 S.Ct. at 2068, for "[i]n every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." Id. at 696.
With these principles before us, we conclude that had Eber's testimony or report been offered, there is no probability, at all, that the jury would have had a reasonable doubt about Thomas's guilt nor that the jury, the trial court, or this court would have concluded that the balance of aggravating and mitigating circumstances did not warrant the sentence of death.
In regard to the impact on Thomas's conviction, we note that the details of the offense and Thomas's obviously calculating participation warrant no finding of a likelihood that the jury would have acquitted Thomas on a theory of lack of criminal intent. Moreover, when these facts are contrasted against the evidence of Thomas's mental state at the time of the offense, there is no reasonable probability that Thomas's trial would have resulted in a non-capital verdict, for had Eber's opinion been introduced, it would have undoubtedly been impeached on cross-examination. Not only could Eber's reputation have been quickly discredited, the reliability of his report would have been put into serious question since Eber never personally examined Thomas; he knew nothing of the particularized circumstances, but rather relied on facts gathered by automation; and his report was inconsistent and its conclusions unsupported. Furthermore, any gain from Eber's favorable testimony would have been shattered by the harm from the expected, unfavorable rebuttal testimony consisting of the opinions of Dr. Blankenship, Donna Click, and the Lunacy Commission. (We recognize that the two reports favorable to the prosecution do not directly address the question of Thomas's sanity at the time of the offense; however, even with this omission, they nullify any value of Eber's report since they impeach Eber's report on every other point.) This latter testimony would have given the jury an even dimmer view of Thomas. See Strickland v. Washington, 466 U.S. at 700,104 S.Ct. at 2071. Thus, by no reasonable circumstance would Eber's testimony or report have been persuasive.
We also find these same considerations to be paramount in our holding that the jury's recommendation of the sentence of death would have been unaffected by Eber's testimony or report. At the sentencing phase, the prosecution reintroduced the evidence submitted at the guilt phase that detailed the horrifying nature of the robbery/murder of Miss Shehane. (See particularly the description of facts found by the trial court to support its finding of the aggravating circumstance that the offense was especially heinous, atrocious, or cruel, 460 So.2d at 215.) "The evidence presented by the state in support of its request for the death penalty was not only substantial but undoubtedly left a deep impression on the jury." Willie v. Maggio,737 F.2d 1372, 1394 (5th Cir. 1984) (wherein the court held, in light of the terrible facts of the capital offense, the petitioner failed to satisfy the "prejudice" prong and, thus, counsel was not ineffective in failing to present mitigating evidence concerning the *Page 257 
petitioner's mental condition, where the evidence in support of the petitioner's allegation of ineffectiveness consisted of two affidavits from lay persons and an affidavit from a psychiatrist who had never examined the petitioner). Even had Hultquist presented Eber's opinion as mitigating evidence, we find no reasonable probability that the omitted evidence would have changed the jury's recommendation. We are confident that its recommendation of Thomas's sentence would have been the same.
Finally, we cannot conceive of any possibility that the trial court's sentence of execution would have been altered by evidence of Eber's opinion. The aggravating circumstances clearly overwhelmed the mitigating circumstance. As we noted on the direct appeal of Thomas's conviction and sentence and in which our supreme court specifically concurred,
 "In the instant case, the aggravating circumstances 'remarkably and exceedingly outweigh the mitigating circumstances. . . .' Dunkins [v. State, 437 So.2d 1349 (Ala.Cr.App. 1983)]. We therefore concur in and affirm the findings of the jury and the trial court that death is the appropriate sentence. 'Indeed, applying the laws of this state and nation to the particular facts of this case, we do not see how any other penalty is justified.' Id."
460 So.2d at 214 (and quoted at 460 So.2d at 227). Our conclusion is buttressed by the reality, that if Thomas were given a new sentencing hearing on this ground, the trial court would have one additional aggravating circumstance and one less mitigating circumstance to consider, for as we noted on direct appeal and, also, our supreme court pointed out, the trial court erroneously refused to consider the evidence of Thomas's three prior convictions for robbery. 460 So.2d at 214 and 225.
In conclusion, we find that Thomas has made no showing that his conviction and sentence were rendered unreliable by a breakdown in the adversary process caused by the alleged deficiency in counsel's assistance. 466 U.S. at 700,104 S.Ct. at 2071. All three proceedings were fundamentally fair. For this reason, the trial court properly denied Thomas's petition on this ground.
 II
In his petition, Thomas further alleges that his appellate counsel was ineffective for their failure to timely file a petition for writ of certiorari to the United States Supreme Court. In support of this assertion, Thomas introduced a series of letters (Defendant's Exhibit H) which he had received from appellate counsel: One stating the attorneys' intent to file for rehearing in the Alabama Supreme Court; one explaining that the rehearing application had been denied and that the next step was to appeal to the United States Supreme Court, which the attorneys had already started preparing; one requesting his signature on motion and affidavit for in forma pauperis status; and a final letter acknowledging receipt of the signed documents and an extension of time to file the brief in the United States Supreme Court to February 7, 1985. Thomas testified that he relied upon this correspondence in concluding that his attorneys were, in fact, representing him in the appeal to the United States Supreme Court. Thomas also introduced letters (Defendant's Exhibit D) to appellate counsel from the Clerk of the Court, explaining the Court's rejection of his petition.
Thomas contends that the trial court erroneously denied his petition for writ of error coram nobis on this ground. However, we find firm authority for the trial court's ruling in the Supreme Court's opinion of Wainwright v. Torna, 455 U.S. 586,102 S.Ct. 1300, 71 L.Ed.2d 475 (1981). There, the Court rejected the claim that the respondent received ineffective assistance of counsel because of his retained counsel's failure to timely file an application for discretionary review at the State's second level of appeal, which failure resulted in the dismissal of respondent's application. In so holding, the Court reiterated its ruling in Ross v. Moffitt, 417 U.S. 600,94 S.Ct. 2437, 41 L.Ed.2d 341 (1974), that a criminal defendant does not have any constitutional *Page 258 
right to counsel to pursue discretionary state appeals or application for review to the United States Supreme Court.455 U.S. at 587, 102 S.Ct. at 1301. (The Court in Ross v. Moffitt
refused to extend the right to counsel beyond the indigent state defendant's first appeal as of right, which is required by Douglas v. California, 372 U.S. 353, 83 S.Ct. 814,9 L.Ed.2d 811 (1963).) From this observation, the Torna Court reasoned, "Since respondent had no constitutional right to counsel, he could not be deprived of the effective assistance of counsel by his retained counsel's failure to file the application timely."455 U.S. at 587-88, 102 S.Ct. at 1301 (footnote omitted). In other words, as the Court later noted, "[T]he right to effective assistance of counsel is dependent on the right to counsel itself." Evitts v. Lucey, 469 U.S. 387, 396-397 n. 7,105 S.Ct. 830, 836 n. 7, 83 L.Ed.2d 821 (1985).
Thomas argues that we should not apply the rationale ofWainwright v. Torna to his case because in Torna the respondent's conviction was not for a capital offense, resulting in the sentence of death, whereas Thomas is under the cloud of execution, which is qualitatively different from imprisonment. While we quickly recognize the apparent differences between the two types of punishment, we know of no reason why the magnitude of the death sentence should distort the guarantee of effective counsel beyond the scope defined by the Supreme Court. See Gray v. Lucas, 710 F.2d 1048, 1061 (5th Cir. 1983) (wherein the court held that since the Sixth Amendment does not guarantee right to counsel for pursuance of a writ of error coram nobis and federal habeas corpus by one sentenced to death, the petitioner was not denied his right to effective assistance of counsel). Accordingly, we hold that since Thomas had no right to counsel to pursue thediscretionary appeal to the United States Supreme Court, he cannot be heard to complain of the representation of any counsel appointed.
 III
The remaining issues presented for our consideration are without merit, for they are not cognizable in a coram nobis petition; either they were addressed on direct appeal or could have been raised at trial and on direct appeal and were not.Luke v. State, 484 So.2d 531, 532 (Ala.Cr.App. 1985).
 "A writ of error coram nobis is appropriate only when the petitioner's claim is based on facts he or she did not know and could not have discovered at the time of trial." Comment, Post-Conviction Remedies in Alabama, 29 Ala.L.Rev. 617, 635 (1978). This rule applies in capital cases involving the death sentence. Ex parte Seals, [271 Ala. 622, 126 So.2d 474, cert. denied, 366 U.S. 954, 81 S.Ct. 1909, 6 L.Ed.2d 1246 (1961)]; Luke v. State, 484 So.2d 531, 532 (Ala.Cr.App. 1985)."
Jackson v. State, 501 So.2d 542, 544 (Ala.Cr.App. 1986).
Accordingly, this cause is affirmed.
AFFIRMED.
All Judges concur.
[1] This report was introduced at the hearing on Thomas's petition and designated as "Defense Exhibit E." This exhibit, as contained in the record originally submitted to this court was, for a large part, illegible. We have supplemented the record before us with the original exhibit which is satisfactory.
[2] In addressing only the "prejudice" component and holding that Thomas failed to meet his burden, we, of course, intimate no view to the effect that Thomas established that defense counsel's performance was deficient. As support for the trial court's finding that counsel's decisions fell within the scope of sound trial strategy, see generally Darden v. Wainwright,477 U.S. 187, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); Jackson v.State, 501 So.2d 542 (Ala.Cr.App. 1986). See also People v.Blue, 114 Mich. App. 137, 318 N.W.2d 498 (1982) (wherein the court ruled that it was sound trial tactics for the defense counsel to not offer the opinion by a psychiatrist, who examined the defendant only once and concluded that the defendant was incompetent, in the face of four reports which were to the contrary and the product of six months' supervision of the defendant). Furthermore, we note that Thomas actively participated in deciding the theories of defense.