Certiorari was granted in this case under Rule 39 (c), A.R.App.P. The facts are treated extensively in the opinion of the Court of Criminal Appeals. On appeal to that court, the petitioner's conviction of the capital offense of murder during a kidnapping, Code of 1975, § 13A-5-40 (a)(1), and her subsequent sentence by the trial court to death by electrocution, were affirmed. Neelley v. State, 494 So.2d 669
(Ala.Crim.App. 1985).
Petitioner has raised before this Court the same issues she presented to the Court of Criminal Appeals. Having reviewed the matters presented by the briefs, oral argument, and the record, this Court has concluded that the decision of the Court of Criminal Appeals must be affirmed. Moreover, only certain aspects of that decision need be addressed in this opinion.
 I. Whether the failure or refusal to inform the petitioner thata lawyer was in the building in which she was beinginterrogated vitiated her confession.
The Court of Criminal Appeals did not decide this issue, holding that any error in the admission of the confession in question was harmless error. However, following the grant of certiorari by this Court, the United States Supreme Court decided Moran v. Burbine, ___ U.S. ___, 106 S.Ct. 1135,89 L.Ed.2d 410 (1986), holding that neither Fifth nor Sixth Amendment rights are violated when police authorities do not inform a suspect of an attorney's efforts to contact the suspect. In so holding, that Court made the following pertinent observations at ___ U.S. ___, 106 S.Ct. 1143:
 "At the outset, while we share respondent's distaste for the deliberate misleading of an officer of the court, reading Miranda [v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)], to forbid police deception of an attorney `would cut [the decision] completely loose from its own explicitly stated rationale.' Beckwith v. United States, 425 U.S. 341, 345, 96 S.Ct. 1612, 1615, 48 L.Ed.2d 1
(1976). As is now well established, `[t]he . . . Miranda warnings are "not themselves rights protected by the Constitution but [are] instead measures to insure that the [suspect's] right against compulsory self-incrimination [is] protected."' New York v. Quarles, 467 U.S. 649, 654, 104 S.Ct. 2626, 2631, 81 L.Ed.2d 550 (1984), quoting Michigan v. Tucker, 417 U.S. 433, 444, 94 S.Ct. 2357, 2364, 41 L.Ed.2d 182
(1974). Their objective is not to mold police conduct for its own sake. Nothing in the Constitution vests in us the authority to mandate a code of behavior for state officials wholly unconnected to any federal right or privilege. The purpose of the Miranda
warnings instead is to dissipate the compulsion inherent in custodial interrogation and, in so doing, guard against abridgement of the suspect's Fifth Amendment rights. Clearly, a rule that focuses on how the police treat an attorney — conduct that has no relevance at all to the degree of compulsion experienced by the defendant during interrogation — would ignore both Miranda's mission and its only source of legitimacy.
 "Nor are we prepared to adopt a rule requiring that the police inform a suspect of an attorney's efforts to reach him. While such a rule might add marginally to Miranda's goal of dispelling the compulsion inherent in custodial interrogation, overriding practical considerations counsel against its adoption. As we have stressed on numerous occasions, `[o]ne of the principal advantages' of Miranda is the ease and clarity of its application. Berkemer v. McCarty, 468 U.S. 420, 430, 104 S.Ct. 3138, 3145, 82 L.Ed.2d 317 (1984); see also New York v. Quarles, supra, 467 U.S., at 660, 104 S.Ct., at 2634
(concurring opinion); Fare v. Michael C., 442 U.S., [707] at 718, 99 S.Ct., [2560] at 2568. [61 L.Ed.2d 197] . . ." *Page 699 
The Court also wrote, at ___ U.S. ___, 106 S.Ct. at 1144:
 "The position urged by respondent would upset this carefully drawn approach in a manner that is both unnecessary for the protection of the Fifth Amendment privilege and injurious to legitimate law enforcement. Because, as Miranda holds, full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process, a rule requiring the police to inform the suspect of an attorney's efforts to contact him would contribute to the protection of the Fifth Amendment privilege only incidentally, if at all. This minimal benefit, however, would come at a substantial cost to society's legitimate and substantial interest in securing admissions of guilt. . . ."
The Court further stated at ___ U.S. ___, 106 S.Ct. at 1146:
 "Questions of precedent to one side, we find respondent's understanding of the Sixth Amendment both practically and theoretically unsound. As a practical matter, it makes little sense to say that the Sixth Amendment right to counsel attaches at different times depending on the fortuity of whether the suspect or his family happens to have retained counsel prior to interrogation. Cf. [Y. Kamisar, Police Interrogation and Confessions (1980)], at 220-221. More importantly, the suggestion that the existence of an attorney-client relationship itself triggers the protections of the Sixth Amendment misconceives the underlying purposes of the right to counsel. The Sixth Amendment's intended function is not to wrap a protective cloak around the attorney-client relationship for its own sake any more than it is to protect a suspect from the consequences of his own candor. Its purpose, rather, is to assure that in any `criminal prosecutio[n],' U.S. Const., Amdt. 6, the accused shall not be left to his own devices in facing the `"prosecutorial forces of organized society,"' Maine v. Moulton, ___ U.S., at. ___, 106 S.Ct., [477] at 484 [88 L.Ed.2d 481] (quoting Kirby v. Illinois, 406 U.S., [682] at 689, 92 S.Ct., [1877] at 1882 [32 L.Ed.2d 411]. . . .
 " . . . The clear implication of the holding, and one that confirms the teaching of [United States v. ] Gouveia, [467 U.S. 180, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984)], is that the Sixth Amendment right to counsel does not attach until after the initiation of formal charges."
Applying Moran v. Burbine to the circumstances of the present case, we hold that neither petitioner's Fifth nor Sixth Amendment rights were violated by the failure of the interrogating authorities (who had given petitioner the Miranda
warnings) to inform her of the presence of an attorney who had been sent at the request of a third party. Nor do we find this conduct by law enforcement officials violative of the constitution of this state.
 II. Whether petitioner's confession was voluntary.
The opinion of the Court of Criminal Appeals accurately summarized the facts on which that court concluded that theMiranda warning was given to petitioner, and that she voluntarily waived her rights. The record fully supports that conclusion. We quote, from the suppression hearing, the testimony of special agent Burns, who was the first officer to interrogate petitioner:
"Q. Did you talk to Mrs. Neelley?
"A. Yes, I did.
"Q. On October 14, 1982?
"A. Yes, sir.
"Q. Without asking you what she said, did you talk to her about the murder of Lisa Ann Millican on that occasion?
"A. Yes, sir; I did.
"Q. Before you asked her anything about that or any other things, I'll ask you if you gave her what's known as theMiranda warning or advised her of her constitutional *Page 700 
rights regarding the making of a statement.
"A. Yes, I did.
"Q. What did you do about that? How did you go about it?
"A. I read to her from our standard form, FD-395, which is entitled `Interrogation Advice of Rights — Your Rights.'
"Q. Is that a document?
"A. Yes; it is.
"Q. What did you do with the document?
"A. I read it aloud to her.
". . . .
"Q. I'll ask you to read to the Court what you read to Mrs. Neelley at that time. When was it, please?
"A. It was read at 6:50 p.m., Georgia time, on 10-14-82 in Murfreesboro, Tennessee. The document is entitled `Interrogation Advice of Rights — Your Rights.' It begins: `Before we ask you any questions you must understand your rights. You have the right to remain silent. Anything you say can be used against you in Court. You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish. If you decide to answer questions now without a lawyer present, you will still have a right to stop answering at any time. You will also have a right to stop answering at any time before you talk to a lawyer.' Then it has a paragraph entitled, `Waiver of Rights. I have read this statement of my rights, and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.'
"Q. You read that to Mrs. Neelley?
"A. Yes; I did.
". . . .
"Q. And you stated you read this to her. Did you allow her to read it?
"A. Yes. After I finished reading the form, I gave it to her and told her to read it.
"Q. Did you know if she read it or not?
"A. She looked at the form, read part of it aloud. After she had finished reading it, I asked her if she was willing to sign the waiver section of the form.
"Q. What did she say?
"A. She said that she thoroughly understood what the form said but that she did not want to sign the form. She also said that she was willing to talk at that time without an attorney present.
"Q. You told her that she could have an attorney if she desired.
"A. That's correct.
"Q. She did not, in fact, sign the form?
"A. That is right. She did not sign it.
". . . .
"Q. Did she then make a statement to you, Agent Burns, about the murder of Lisa Ann Millican and other things also?
"A. Yes; she did.
"Q. Was the statement that she made to you made freely and voluntarily?
"A. Definitely.
"Q. Was it make of her own free will and accord?
"A. Yes; it was.
"Q. Did you or anyone else in your or her presence make any promises or threats or offers of reward to induce her to make a statement?
"A. Absolutely not.
". . . .
"Q. Did she, the defendant, Mrs. Neelley, at any time throughout that entire interview indicate to you that she did not want to talk any more to you and that she did, in fact, want an attorney?
"A. Absolutely not; to the contrary.
"Q. I want to go on now, and you recall Mr. French underlining or highlighting *Page 701 
some things for you to read or recall about a statement that she had made concerning her attorney, Mr. Burton.
"A. Yes; I do.
"Q. I want you to go further and relate to us the next paragraph, please sir.
"A. The next paragraph begins, `She did state that she was willing to talk about any other matter. She was told at that time that if she wanted to terminate the interview that she could and that she could return to her cell without any further questioning. She insisted that she did not want to leave the interview and wanted to continue talking at that time.'
"Q. All right, now, we have used the term `issue' and we have used the term `matter.' What were we talking about? What was the issue or matter under discussion between you and Mrs. Neelley at that time?
"A. We were asking her about passing raised money orders and passing them throughout the states of Alabama and Georgia, and that's the only thing we were talking about at that time.
"Q. And she told you she did not want to talk about traveling through those states to pass money orders or checks?
"A. That's correct.
"Q. And she told you without her attorney present and told you that Mr. Burton was her attorney?
"A. That's correct.
"Q. What was Mr. Burton her attorney concerning?
"A. It's my understanding that he was her attorney regarding the charges in Murfreesboro which were for other checks and money orders.
"Q. You were not interrogating her about those; is that correct?
"A. That is correct.
"Q. At the time you interviewed her there that night, Mr. Burns, Agent Burns, did she have an attorney with regard to the Lisa Ann Millican murder? Had one been appointed or had she retained one at that time?
"A. No.
"Q. As far as you knew at that time she was not even represented on that; is that correct?
"A. That is correct. She had not been represented regarding that matter.
"Q. When she told you — when you read her the Miranda
warning and talked to her about it otherwise she told you she did not want an attorney and she was willing to talk with you?
"A. That's correct.
"Q. At any other time during that interview or that procedure that night did you ask her if she wanted to stop the interview?
"A. Yes; I did.
"Q. Tell us about that time or times, please sir.
"A. There were numerous occasions. At 7:29 p.m. — let me correct that. At 7:25 p.m. when she told me she did not want to talk about those money orders without her attorney present —
"Q. Excuse me. Did you talk to her any more about money orders even in the state of Alabama and Georgia then after she told you that.
"A. Not until much later in the interview when she volunteered information herself.
"Q. All right, I'll ask you about that in a moment. Go ahead. At what other times did you indicate she could stop the interview?
"A. At 7:25 she was then told that she could stop and she could return to her cell. At 7:29 —
"Q. What did she tell you at 7:25 when you told her that?
"A. Well, I was telling her that beginning at 7:25.
"Q. All right.
"A. At 7:29 she said that she wanted to continue the interview and that she did not want to leave and that she did want to talk *Page 702 
about all other matters. Then at 7:49 she was told that the interview could be stopped and again she could return to her cell, and she said that she did not want to return to her cell and that she wanted to continue discussing other matters.
"THE COURT: What time was that?
"A. That was 7:49, Your Honor. At 8:32 p.m. — and all of these are Georgia times — she was again told that she could return to her cell and that the interview could be terminated, and she said she did not want to. Then at 9:10 p.m., when Investigator Smith came in to the interview room, she was again told that she could leave, she could return to her cell, the interview could terminate, and at that time she told me that she was sick of hearing that; she didn't want to return to her cell and she wanted to keep on talking."
Petitioner's version of the interview did not materially differ from that of Agent Burns:
"Q. All right, you recall that the — you said you recall that they read your rights to you; is that right?
"A. Yes, sir.
"Q. And you recall this being read to you: `I have read this statement of my rights, and I understand what my rights are.'
"A. Yes, sir.
"Q. `I am willing to make a statement and answer questions.'
"A. To a certain extent I told them I would answer questionsabout my background.
"Q. You remember that being read to you?
"A. Yes, sir.
"Q. And you got a chance to read it yourself, didn't you?
"A. Yes, sir.
"Q. Do you remember hearing read to you or reading yourself: `I do not want a lawyer'?
"A. When he read that; yes.
"Q. And you read it yourself?
"A. Yes.
"Q. And you remember this — being read to you or you reading it: `I understand and know what I am doing.'
"A. Yes, sir.
"Q. And at that time you told them that you wanted to talk tothem and did not want an attorney present, didn't you?
"A. Yes, sir.
"Q. Later in the interview something was said about some money orders, wasn't it?
"A. Well, it — they said the reason they were there was to discuss money orders from Alabama and Georgia.
"Q. Did they tell you, Mrs. Neelley, that that was the only reason they were there?
"A. They mentioned nothing about anything in Fort Payne or anything about murder until a couple of hours later.
"Q. Did they tell you that that was the only reason they were there, to talk about money orders?
"A. I asked them if that was the only reason. They avoided the issue. They didn't really answer. They just changed the subject. They didn't say —
"Q. Who is they?
"A. Bill Burns and Lester Stuck. Lester Stuck didn't say very much. Bill Burns did most of the talking.
"Q. At what point in the interview did you tell them that you wanted to talk to your lawyer? Did you say you wanted to talk to a lawyer or see a lawyer? How did you tell them that?
"A. I said, `I want to speak to my lawyer.'
"Q. When did you tell them that?
"A. Well, when they first arrived, I told them I would like to speak to my lawyer before I answered any questions. They said it was just a few routine questions about my background.
"Q. They said. Who said that? *Page 703 
"A. Bill Burns did.
"Q. All right. He said what?
"A. That it was just a few routine questions about my background, and if it was all right, he would like to ask me those questions.
"Q. And you told him you wanted to talk to a lawyer?
"A. I had told him before he said that, and I said since all he wanted was some background information I would answer that without a lawyer present.
"Q. I'll ask you if it's not a fact that the only time you mentioned anything about not wanting to talk about anything was later in the interview they asked you about some money orders and you told them that Bill Burton was your attorney and you did not want to discuss that issue without Mr. Burton.
"A. That's not correct.
"Q. That's not correct?
"A. No; it is not.
"Q. I'll ask you if you didn't, in fact, tell them even later in the interview that you did, in fact, want to talk about the money orders.
"A. I don't recall saying that.
"Q. That in substance.
"A. That's not what I'm saying. They asked me about the money orders when they first got there, and I told them I didn't want to discuss it. I told Bill Burns I did not want to discuss it, and he asked me if it was all right if he could ask me a few other questions about my background. We talked for over an hour about my background, where I was from and such things as that. Then he started to get into the money orders, and I told him I didn't want to talk about that. Not in — I don't know exactly what words I used, but I said I wasn't going to say anything about it without my lawyer present.
"Q. My question to you was even later than that in the interview is it not a fact that you told Mr. Burns that you did want to talk about the money orders.
"A. I'm not sure if I said that. Later —
"Q. That's my question to you. Did you say that or not?
"A. I do not know.
"Q. You're saying you don't know that?
"A. I don't know if I said that or not.
"Q. What did you say about that?
"A. Well, after we got off the subject of the money orders they started talking about — they were asking me about what I did at certain times, where I was at. I thought it was pertaining to the money orders, and I didn't give any details or anything, and later they got into asking me if I knew people concerning this case —
"Q. I'm talking to you now about the money orders.
"A. — this case in Fort Payne. I understand that. I'm trying to explain it. The subject was dropped about the money orders later in the evening, and then later, once again, it was picked back up and —
"Q. How was it picked back up?
"A. I don't remember exactly. It was just mentioned again.
"Q. Isn't it a fact you're the one that picked it back up?
"A. I don't believe so. I would not voluntarily say that I wanted to talk about the money orders, because I was not wanting to say anything about the money orders without my attorney.
"Q. Do you recall at about 7:25 being told you could stop talking if you wanted to and go back to your cell?
"A. Yes, sir.
"Q. What did you tell them?
"A. I told them that before I went back I'd like to find out a few more details about what they were wanting to know.
"Q. You had really turned it into an interview of them. Is that what you're telling us?
"A. Not really. I was not interviewing them. I was being interviewed. I just wanted to find out exactly what they were *Page 704 
there for. They were mostly beating around the bush. They wouldn't exactly —
"Q. You were trying to find out what they knew?
"A. Not exactly.
"Q. What do you mean not exactly?
"A. I would not say that.
"Q. What would you say?
"A. I was trying to find out what they were trying to get me to say. Excuse me. I did not mean it like that.
"Q. Did you tell them when they told you at 7:25 that you could stop talking — did you tell them that you wanted to stop talking?
"A. No; I did not.
"Q. What about at 7:49? You recall that, [they] once again told you that they would stop talking to you; you could go back to your cell if you wanted to?
"A. I don't recall the times, but several times during the night they told me I could go back to my cell if I wished to, and I told them I wanted to talk to my husband. I knew he was being interviewed, and they said they were trying to arrange that, if they could, and I said I wanted to find out what else they wanted me for. I mean in substance what else they were talking about.
"Q. You were still trying to find out things from them.
"A. You could say that.
"Q. You recall the last time they asked you if you wanted to stop talking to them? Do you recall telling them you were sick of hearing that or tired of hearing that and you wanted to go on talking?
"A. I did not say that. I said I wish that he would stop saying that. I didn't say it as he said I did.
"Q. You told him that you wished he would stop asking you if you wanted to stop talking.
"A. Yes, sir.
"Q. And you did want to continue talking.
"A. Yes, but I was not volunteering information, as he said I was." (Emphasis added.)
The facts concerning the giving of the Miranda warning to Mrs. Neelley by Agent Burns were also clearly established, both in the State's case-in-chief and upon Burns's cross-examination. These facts, together with those facts referred to in the opinion of the Court of Criminal Appeals, provide a sound basis for finding that petitioner understood her Miranda rights, including the right to counsel, yet knowingly and intelligently waived them. See Harris v. State,420 So.2d 812 (Ala.Crim.App. 1982), and cases cited therein. Moreover, the preponderance of the evidence adduced supports the trial court's finding that the confession was voluntarily made. Simpson v. State, 401 So.2d 263 (Ala.Crim.App.), cert.denied, 401 So.2d 265 (Ala. 1981).
 III.
Although at trial petitioner proffered no evidence on the issue, she nevertheless argues that the exclusion of jurors because of their views on capital punishment denied her the right to an impartial jury drawn from a cross-section of the community.
The precise question was decided on May 5, 1986, by the United States Supreme Court in Lockhart v. McCree, ___ U.S. ___, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). That Court, after lengthy consideration, concluded at, ___ U.S. ___,106 S.Ct. 1766:
 "In sum, `Witherspoon-excludables,' or for that matter any other group defined solely in terms of shared attitudes that render members of the group unable to serve as jurors in a particular case, may be excluded from jury service without contravening any of the basic objectives of the fair cross-section requirement. See Lockett v. Ohio, 438 U.S. 586, 597
[98 S.Ct. 2954, 2960-61, 57 L.Ed.2d 973] (1978). . . . It is for this reason that we conclude that `Witherspoon-excludables' do not constitute a `distinctive group' for fair cross-section purposes, and hold that *Page 705 
`death qualification' does not violate the fair cross-section requirement."
We pretermit discussion of the other issues raised before this Court by petitioner. Those issues were considered by the Court of Criminal Appeals, and we find them to have been correctly decided.
Let the judgment be affirmed.
AFFIRMED.
All the Justices concur.