[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1304 
The appellant, Curtis Wayne Wesson, was convicted of attempted rape in the first degree. He was sentenced as a habitual felony offender to imprisonment for life and was ordered to pay $50 to the Crime Victims' Compensation Fund and to pay restitution in the amount of $603.45. Four issues are raised in this appeal.
 I
The appellant asserts that the State was improperly permitted to amend the indictment. He contends that the indictment charged him with first degree rape, but was amended at trial without his consent to charge attempted rape in the first degree.
No objection was made during trial to any alleged amendment of the indictment. The issue was raised for the first time in the appellant's motion for a new trial. Consequently, the issue is not properly before this Court. See Vance v. City ofHoover, 565 So.2d 1251, 1253 (Ala.Cr.App. 1990) ("[a]n objection to an [alleged] improper amendment [of an indictment or a complaint] must be made in a timely manner or it is waived") (allegation of improper amendment untimely where raised for the first time in a motion for new trial). Nevertheless, we will address the merits of this issue because a resolution thereof is necessary to the disposition of the appellant's ineffective assistance of counsel claim discussed in Part IV below.
At the outset, we note that the single-count indictment is facially inconsistent. In one portion of the indictment appears the following: "CHARGES: 1. ATTEMPTED RAPE, FIRST DEGREE." C.R. 2. However, the body of the indictment alleges that the appellant "did engage in sexual intercourse with a female, to wit: [the victim], by forcible compulsion, in violation of Section 13A-6-61 of the Code of Alabama," id., which clearly charges rape in the first degree.[1] Despite the contradictory portions of the indictment, the appellant did not challenge this indictment in any manner prior to trial.
The appellant testified at the hearing on his motion for a new trial that he "was indicted for first degree rape" and that this indictment was amended without his consent by the prosecutor during opening arguments. R. 428. He denied "know[ing] anything about any amendment to the indictment prior *Page 1305 
to the trial," and also denied that the trial judge "sa[id] anything to the jury about what the indictment was." R. 428, 430.
The opening arguments are not contained in the transcript. We note, however, that at least three times during the jury selection process, the trial court stated that the appellant was "charged with the offense of attempted rape in the first degree." R. 4, 8, 48 (emphasis added). Also during the jury selection process, the prosecutor stated:
 "[T]he allegations in this case have never actually been rape; it's always been attempted rape, but since it is a lesser included part of the indictment, you know, I don't want you to be confused that the charge was actually rape in the first degree. The charge is attempted rape in the first degree."
R. 13-14 (emphasis added). The appellant did not object or respond in any way to any of these statements.
The indictment was not discussed until the close of the State's case. At that time, the following occurred:
 "MR. SMITH [trial counsel]: The defense at this point would move for a judgment of acquittal and dismissal of the charges based upon non-sufficient evidence. The indictment charges rape. There is no evidence of that.
"THE COURT: I think attempted rape.
"MR. SMITH: It charges, I think, rape.
 "MR. LEMLEY [prosecutor]: There was an error in the indictment. To save time from re-indicting him from the beginning —
"MR. SMITH: Read it.
"THE COURT: You are talking about the text?
 "MR. LEMLEY: Unfortunately, we put the wrong thing. We didn't see any need to have to correct it. We would not object technically to movement on the charge of rape, but would object for attempted rape.
 "MR. SMITH: There is not sufficient evidence on attempted rape either and we ask for a judgment of acquittal.
 "THE COURT: To the extent that the text or body of the indictment charges the offense of rape, I do direct a judgment of acquittal as to that. With respect to this captioned charge in the indictment of attempted rape in the first degree carried as an automatic lesser included offense to the offense charged in the body of the text, the court denies the motion for [judgment of] acquittal." R. 255-56.
Despite the fact that this case appears to have been treated since the date of the offense as a case of attempted rape,[2]
we agree that the indictment charged the appellant with rape in the first degree.[3] The body *Page 1306 
of the indictment, which "is the vital portion of the indictment," 42 C.J.S. Indictments and Informations
§ 34 (1991), clearly tracks the language of Ala. Code 1975, § 13A-6-61(a)(1), which defines rape in the first degree. "A misnomer in the caption of the offense sought to be charged . . . does not in any wise affect the validity of the indictment." 41 Am.Jur.2d Indictments and Informations
§ 47 (1968). Nor does it, in our opinion, take precedence over the body of the indictment.
However, we cannot agree with the appellant that the indictment in this case was ever actually amended.
Compare State v. Woodson, 845 P.2d 203, 204 (Or. 1993) (trial court, at request of prosecutor, "amended the indictment by interlineation by adding the words 'attempt to' before the words 'engage in sexual intercourse with [victim]' "). As previously noted, the indictment itself is facially inconsistent, with the caption or heading stating that the charge is attempted rape in the first degree and the body charging rape in the first degree. The trial court appears to have initially proceeded under the belief that the indictment charged the appellant with attempted rape in the first degree. The appellant did nothing to correct this belief until the close of the State's case. Once the problem was brought to its attention, the trial court adopted the prosecutor's position that attempted rape was a lesser included offense under the original indictment for rape in the first degree.
Under Rule 13.2(c), A.R.Crim.P.,[4] "[s]pecification of an offense in an indictment or information shall constitute a charge of that offense and of all lesser offensesnecessarily included therein." (Emphasis added.) By statute, an attempt may be a lesser included offense of the charged offense. Ala. Code § 13A-1-9(a)(2). Consequently, "there is no requirement that an indictment specify that a defendant attempted to commit a particular substantive offense for that defendant to be convicted of attempting to commit the offense." Reese v. State, 456 So.2d 341,347 (Ala.Cr.App. 1982) (emphasis in original), cert. denied,464 U.S. 838, 104 S.Ct. 127, 78 L.Ed.2d 124 (1983), quoted inHartley v. State, 598 So.2d 2, 4 (Ala.Cr.App. 1991). "The concept of a lesser included offense does not involve either an amendment of the indictment or a variance between the pleading and the proof." Black v. State,586 So.2d 968, 970 (Ala.Cr.App.), cert. denied, 586 So.2d 970 (Ala. 1991). There was no improper amendment of the indictment.
 II
The appellant challenges both the sufficiency and the weight of the evidence.
The victim testified that at the time of the incident she was an undergraduate student at the University of Alabama. She stated that around 11:30 p.m. on the evening of April 15, 1989, she went with Jerald Wesson, the appellant's brother, to a party at a house trailer located in a rural area of Tuscaloosa County. According to the victim, at the time of this party she had been dating Jerald, who was known as Jerry, for "[t]hree to four weeks." R. 88. During that time, she had become acquainted with the appellant and, on occasion, had babysat for the appellant's children.
The victim stated that she had "had a couple of beers" before leaving her apartment to go to the party, but stated that she had not drunk any "hard liquor" and denied that she was "intoxicated." R. 93. She esti.mated that it took 15 to 20 minutes for them to drive from her apartment to the house trailer where the party was held and she stated that she did not drink anything during the drive. The victim testified that there "were a few people" present at the party when she and Jerry arrived and that "four, *Page 1307 
maybe five" of those people were playing a drinking game called "quarters." R. 143-44. She described the game of "quarters" as follows: "[Y]ou have a cup in the center of the table where you are playing, and you have to bounce the quarter off the table into the cup in the center. And if you miss, you have to drink." R. 143. The victim stated that she and Jerry watched this game for a while but did not participate. The victim testified that she "could have" had something to drink at the party, but that "[i]t would have been just a little." R. 146. She stated that she did not, to her knowledge, "get intoxicated." Id.
The victim said that after she and Jerry watched the quarters game for a while, they sat down on a couch nearby and Jerry fell asleep. At some point, the appellant had arrived at the party and he issued a general invitation for someone to go to the store with him to buy more beer. The victim stated that she "didn't have anything else to do because Jerry was asleep," so she went with the appellant to his truck. R. 149.
The victim said that she "knew [the appellant] had been drinking," but that she "didn't believe that he was intoxicated" at the time she left the party with him. R. 152. However, "as [they] were leaving the drive, [she] started to be suspicious that he could have been because . . . he left the drive at a fairly high rate of speed and hit a small tree on the side of the drive." R. 152-53. The victim stated that after the appellant hit the tree, she asked him to slow down and he did so, but he again began driving fast once they were out of the drive. She said that the appellant had told her that the store was "fairly close" and that, after they had been driving a while, she asked him where the store was. The appellant responded, "[W]e will get there," and continued driving. R. 154.
The victim testified that she did not remember "exactly how long [they] were on the road" or "if [the appellant] turned off one road onto another." R. 155. However, the appellant eventually "turned off of a road and drove the truck into an area that appeared that they were working on it to clear it for a housing development." Id. The victim stated that she could see "what [she] thought were bulldozers in the area" and that "part of the area was already cleared and the rest of the area was a wooded area." R. 156. She testified that the appellant drove through the cleared area and stopped the truck near the wooded area.
According to the victim, before he turned into the cleared area, the appellant had "told [her] that he wanted to see Dollie." R. 157. When asked to explain what the appellant meant by this, the victim responded, "He was referring to a country singer, Doll[y] Parton, and he was referring [sic] that he wanted to see my breasts." Id. The victim stated that after the appellant stopped the truck he again told her "that he wanted to see Dollie." Id. The victim said that when she said no, the appellant "said that he didn't care if [they] had to sit there . . . all night, [he was] going to see Dollie." Id. He then began trying to pull up her sweater and bra and a struggle ensued.
The victim stated that she was kicking and "hitting at" the appellant while trying to pull her sweater and bra down. R. 159. She managed to get out of the truck, but the appellant came after her and pulled her back into the truck. The victim testified that the appellant "again tried to pull [her] sweater and bra off," then said, as she continued to kick and hit him, "If I can't see Dollie, then I am going to get me some pussy." R. 160. The victim stated that the appellant then unbuttoned her jeans and tried to unzip them. At this time, the victim said she was lying on the seat of the truck with her "legs dangling off the seat to the outside of the truck and [the appellant] was standing at the door of the truck leaning over [her]." R. 164. She stated that the appellant "pulled a knife out and held the blade in front of [her] face and told [her] that if [she] didn't do what he wanted that he was going to cut [her] up into pieces and leave [her] for someone else to find." R. 169. The victim described this knife as a small folding or pen knife and said that it was about four inches long when open.
The victim testified that she managed to get out of the truck again and tried to run away, but the appellant caught her and pulled her to the ground beside the truck. *Page 1308 
The appellant then attempted to pull her jeans off by the cuff. She stated that she continued to struggle with the appellant and, although he pulled her jeans down to her knees, she was able to get away from him and pull them back up. She again tried to run away, but the appellant caught her again and "knocked [her] back down to the ground at the back of the truck." R. 168. He then hit her on the right side of her forehead and again began trying to pull her sweater and jeans off.
The victim stated that she managed to get away from the appellant once again and that this time she was able to run into the wooded area. She came back to the edge of the clearing twice, but saw that the appellant was looking for her and returned to the woods. The victim said that she ran into the wooded area, stopping only when she heard the sound of water running. She stated that she remained in the woods until daylight when she went to a nearby house and sought help.
Around 8:00 a.m. on April 16, 1989, the victim was taken to a local hospital where she was treated for abrasions. The attending physician, Dr. Robert Posey, read the following excerpt from his "history" on the victim:
 "[A] twenty-year-old white female was assaulted by a male who is known to her last p.m. She states that he hit her in the head, there was no loss of consciousness. She had multiple abrasions secondary to running through the woods trying to escape. He did not sexually assault her although he attempted but did not make contact with her genital area. He pulled her blouse and bra up and britches down to her knees but never made any progress toward sexual assault."
R. 107. Dr. Posey testified that the victim "had some tenderness in the right side of her scalp where she had been struck" and that she "had a small contusion, a little reddened area around the left eye which would have been consistent also with being struck with a blunt object." R. 108.
Dr. Posey also stated that there was no indication that the victim was intoxicated and no tests for alcohol or drug levels were made. Under questioning by defense counsel, Dr. Posey stated that alcohol "is metabolized [by the body] at .017 milligrams percent per hour," and that "if your alcohol level was point one, it would take roughly six hours to metabolize to zero." R. 124. Shortly thereafter, the following occurred:
 "Q. [By defense counsel:] What are the symptoms when someone is at point one legal intoxication?
 "A. That depends on someone's tolerance to alcohol. Somebody who is an alcoholic and used to drinking, they function very well at point three. I have had a person come in and ask for lunch at point five.
"Q. At point five?
 "A. Yeah, which would be lethal for someone who had no tolerance for alcohol. But the reaction or somebody's overall ability to function or their outward appearance depends a great deal on their tolerance to alcohol." R. 124-25.
The appellant's truck was found in a ditch a short distance from the cleared area where the victim alleged that the attack took place. A search of the truck yielded a hair bow belonging to the victim, but no folding knife.
The appellant called several witnesses and concluded his defense by testifying in his own behalf. The appellant's brother Jerry testified that he and the victim were drinking beer on the way to the party and that the appellant was already at the party when he and the victim arrived. According to Jerry, the appellant was "[a]bout half-way [drunk]" at that time and was playing the drinking game of quarters. R. 263, 262. Jerry stated that he and the victim began playing quarters also. He said that he drank "[a] good bit" at the party and that everyone present, including the victim, was drunk or intoxicated. R. 263. Jerry stated that during some "wrestling" or "horsing around," he accidentally pushed the victim "on to the coffee table or something," but he did not remember "where she got hurt." R. 264. He then fell asleep or "[p]robably passed out" and did not awake until the next morning. R. 265. On cross-examination, Jerry acknowledged that he had given a statement to the police on April 17, 1989, in which he related that the victim had "told [him] that [the appellant] *Page 1309 
had pulled a knife on her and tried to rape her." R. 277, 278-79.
One of the hosts of the party, Robert Cronan, also testified that Jerry and the victim played quarters and that everyone at the party was drinking. He testified that the appellant appeared to be a "[p]retty good bit" intoxicated. R. 303. Cronan stated that the appellant and Connie Kisiah went to the store for more beer at some point, that after they returned he passed out, and that he did not know when or how the victim left.
Connie Kisiah testified that everyone at the party was drinking and playing quarters. She stated that the appellant got "pretty drunk," although she "couldn't exactly tell . . . how drunk he was." R. 310. She said that during some "playing around," the victim's "head got knocked on the table." R. 311. Ms. Kisiah stated that she went with the appellant to the store for more beer, but she was unsure of the time they left. When asked by defense counsel how the appellant drove, Ms. Kisiah responded, "Drove all right. He wasn't wild or nothing if that is what you are asking me." R. 313. She stated that the appellant did not make any inappropriate advances toward her during the trip to and from the store. Ms. Kisiah said that when she and the appellant returned from the store, the appellant got "even drunker." R. 319. Ms. Kisiah stated that when she left the party the victim and the appellant were still there.
The parties stipulated that, if he were called to testify, Phillip Cronan, a brother to Robert Cronan and the other host of the party, would testify that everyone present at the party "was drinking a lot"; that the victim "played quarters in the kitchen and got very drunk"; that the appellant "was already drunk when he got to the party and he continued to drink at the party"; and that both the victim and the appellant "were what [Cronan] would call very drunk by the time the party started to break up." R. 321. It was also stipulated that Phillip Cronan would testify that "[a]t one point [the victim] and Jerry were wrestling or rolling around in the floor. Jerry threw her down and she hurt her head because she complained about it."Id.
The appellant testified that until six months prior to the trial (which took place in January 1993), he had been an alcoholic and had drunk "probably anywhere from a hundred and fifty to two hundred and fifty dollars worth a week." R. 330. He said that the Cronans were his next-door neighbors and that, around 5:30 p.m. on the night of the party, he and Robert Cronan purchased beer and whiskey for the party. They went to the Cronans' trailer and began drinking the beer and talking. According to the appellant, by the time people started arriving for the party, which was sometime between 9:00 and 10:00 p.m., he had drunk "about a half case or so" of beer. R. 334.
The appellant stated that everyone at the party was drinking and playing quarters. At some point, they ran out of beer and began playing the game with the hard liquor. The appellant stated that he and Ms. Kisiah went to a local store to purchase more beer. He said that he purchased "a case or better" on this trip, but that it "was gone in forty-five minutes at least, not longer than an hour." R. 336-37. According to the appellant, the party began to break up at this point. He stated that he drove over to a friend's house, but no one was home, so he drove back to the Cronan trailer. He said that he was "highly intoxicated" at the time. R. 338.
The appellant testified that he did not go inside the Cronan trailer when he returned. He said that Phillip Cronan was standing in the doorway to the trailer and that he told Phillip that he was going back to the store and asked if anyone wanted to go with him. According to the appellant, Phillip told him that everyone was gone, so he went back to his truck and began backing down the driveway. The appellant stated that the victim then "came running out and got in [his] truck." R. 339. He testified that he drove to the end of the dirt road "and that was all [he] remembered." Id. He stated that some friends told him that they found him in his truck in a ditch; that he "was too totally plastered"; and that "[t]hey had to tote [him] in." R. 339.
As noted above, the appellant challenges both the sufficiency and the weight of the *Page 1310 
evidence. We have previously explained that these are two entirely different matters:
 "The sufficiency of the evidence concerns the question of whether, 'viewing the evidence in the light most favorable to the prosecution, [a] rational fact finder could have found the defendant guilty beyond a reasonable doubt.' Tibbs v. Florida, 457 U.S. 31, 37, 102 S.Ct. 2211, 2216, 72 L.Ed.2d 652 (1982). Accord, Prantl v. State, 462 So.2d 781, 784
(Ala.Cr.App. 1984). . . .
 "In contrast, '[t]he "weight of the evidence" refers to "a determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other." ' Tibbs v. Florida, 457 U.S. at 37-38, 102 S.Ct. at 2216 (emphasis added)."
Johnson v. State, 555 So.2d 818, 819-20
(Ala.Cr.App. 1989).
The appellant was convicted of attempting to commit the form of rape defined in Ala. Code 1975, § 13A-6-61(a)(1): "engag[ing] in sexual intercourse with a female by forcible compulsion." An attempt is defined as "do[ing] any overt act towards the commission of [a specific] offense" with "the intent to commit [that] offense." § 13A-4-2(a). The appellant asserts that the evidence did not sufficiently establish either intent or an overt act; he also contends that the weight of the evidence precluded a finding that he had the requisite intent to commit forcible rape.
As with a rape conviction, a conviction for attempted rape "may be based solely on the victim's uncorroborated testimony."Smith v. State, 604 So.2d 434, 436 (Ala.Cr.App. 1992). In this case, the victim testified that after struggling with her in an effort to pull up her sweater and bra, the appellant said, "If I can't see Dollie, then I am going to get me some pussy"; that he threatened her with a knife; and that he repetitively attempted to remove her jeans, and at one point had pulled her jeans down to her knees. This testimony was clearly sufficient to establish both an overt act and intent. See Johnson v. State, 473 So.2d 652, 657
(Ala.Cr.App. 1985) (evidence sufficient to support conviction for attempted rape where defendant threatened victim with a knife, told her "that he wanted to 'f___' her," placed her hand on his exposed penis, and "jerked her pants down").
In support of his argument that the evidence was not sufficient to show an overt act on his part, the appellant points to the absence of any evidence that he "ever removed any portion of his own clothing or even attempted to do so" and to the absence of "evidence of any attempt at penetration." Appellant's brief at 15. However, such evidence is not necessary to establish an overt act toward the commission of a forcible rape. See Williams v. State, 445 So.2d 949,950-51 (Ala.Cr.App. 1983) (evidence sufficient to support conviction for attempted rape where defendant gained access to victim's residence under false pretenses, forced her at gunpoint to her bedroom where he ordered her to take off her clothes, but left taking her money after she pleaded with him not to "do this"; no mention of any evidence that defendant removed or attempted to remove his clothes or those of the victim or that he attempted penetration); Cogman v.State, 424 So.2d 1355, 1356-57 (Ala.Cr.App. 1982) (evidence sufficient to support conviction for attempted rape where defendant "entered the home of the victim," "went to her bedroom wh[er]e she was on her bed, got on top of her," "pulled at her underwear," choked her after she pulled his hair in an attempt to make him leave, then "left the house without having consummated an act of sexual intercourse"; no mention of any evidence that defendant removed or attempted to remove his clothes or that he attempted penetration); cf. Jones v.State, 346 So.2d 529, 530 (Ala.Cr.App. 1977) (evidence sufficient to support conviction for assault with intent to rape where defendant forcibly entered victim's car, threatened and cut victim with knife, and said to victim, "I want you, baby"; no mention of any evidence that defendant removed or attempted to remove his clothes or that he attempted penetration); Brummitt v. State, 344 So.2d 1261,1262-63 (Ala.Cr.App. 1977 (evidence sufficient to support conviction for assault with intent to rape where defendant threatened victim with knife, told her that " 'if she didn't give him nothing, he was going to cut her,' " then "unbuckled her jeans, put his hand under her *Page 1311 
underwear and touched her private parts"; no mention of any evidence that defendant removed or attempted to remove his clothes or that he attempted penetration).
With regard to the element of intent, the Alabama Supreme Court has stated:
 "Intent, we know, being a state or condition of the mind is rarely, if ever, susceptible of direct or positive proof and must usually be inferred from the facts testified to by witnesses and circumstances as developed by the evidence."
Pumphrey v. State, 156 Ala. 103, 106, 47 So. 156, 157
(1908). We have noted "the difficulty of fathoming the mind of [a] defendant to such an extent that it can be determined with absolute certainty that his conduct included an intent by him to engage in sexual intercourse with [the victim] by forcible compulsion." Williams v. State, 445 So.2d at 951. However, in this case, as in Jones v. State, 346 So.2d at 530, it is clear to this Court that "the acts and conduct of [the appellant], the presence of a knife in his hand and his comments [were sufficient to] present a jury question as to his intent" when he was struggling with the victim in the clearing.
The appellant further maintains that the element of intent was negated by the uncontroverted evidence that he was intoxicated and he asserts that the jury verdict was therefore contrary to the great weight of that evidence.
 " 'Voluntary drunkenness neither excuses nor palliates crime.' Ray v. State, 257 Ala. 418, 421, 59 So.2d 582, 584 (1952). 'However, drunkenness due to liquor or drugs may render [a] defendant incapable of forming or entertaining a specific intent or some particular mental element that is essential to the crime.' Commentary to Ala. Code 1975, § 13A-3-2. Where the defendant is charged with a crime requiring specific intent and there is evidence of intoxication, ' "drunkenness, as affecting the mental state and condition of the accused, becomes a proper subject to be considered by the jury in deciding the question of intent." ' Silvey v. State, 485 So.2d 790, 792 (Ala.Cr.App. 1986) (quoting Chatham v. State, 92 Ala. 47, 48, 9 So. 607 (1891))."
Fletcher v. State, 621 So.2d 1010, 1019
(Ala.Cr.App. 1993) (emphasis in original) (footnote omitted). However, "[t]he degree of intoxication necessary to negate specific intent . . . must amount to insanity." Ex parteBankhead, 585 So.2d 112, 121 (Ala. 1991). The intoxication "must be of such character and extent as to render the accused incapable of consciousness that he is committing a crime."Jones v. State, 362 So.2d 1303, 1315
(Ala.Cr.App. 1978).
As the appellant points out, even the victim's testimony indicated that he was intoxicated on the night in question. However, while the witnesses who were present at the party testified that the appellant was intoxicated, no one testified that he was unable to walk, talk, or otherwise function. In fact, the only evidence indicating that the consumption of alcohol adversely affected the appellant was the victim's testimony concerning the appellant's initial erratic driving when they left for the store and the appellant's own testimony that he remembered nothing after the victim got in his truck. We observe, however, that the appellant appeared readily able to recall the events of the evening up until the point he left with the victim. We also note that the jury had before it the testimony of Dr. Posey concerning intoxication in relation to one's tolerance for alcohol and the appellant's testimony that at the time of the incident he was an extremely active alcoholic.
As in all cases involving the issue of a defendant's intoxication, it was within the sole province of the jury to determine the degree to which the appellant was intoxicated. See Striplin v. City of Dothan,607 So.2d 1285, 1287 (Ala.Cr.App. 1992) ("whether intoxication is substantial enough 'to render intoxicated persons incapable of forming a specific intent . . . is a question for the jury' ");Cogman v. State, 424 So.2d at 1357 ("[t]he extent of any intoxication of defendant and whether or not he intended to rape the alleged victim became issues for the triers of fact, the jury, to determine"); Brooks v. State,520 So.2d 195, 200 (Ala.Cr.App. 1987) (whether defendant "was too intoxicated to form the specific intent necessary to commit the crime of rape in the first degree" was *Page 1312 
issue for jury to resolve). In making this determination, the jury alone decides the weight and credibility to be accorded the testimony of the various witnesses, including that of the appellant. See, e.g., Brown v. State, 588 So.2d 551,559 (Ala.Cr.App. 1991); Anderson v. State,542 So.2d 292, 296 (Ala.Cr.App. 1987), cert. quashed, 542 So.2d 307
(Ala.), cert. denied, 493 U.S. 836, 110 S.Ct. 116,107 L.Ed.2d 77 (1989); Glover v. State, 20 Ala. App. 547, 548,104 So. 48, 50 (1925). "[I]t is not the province of this court to reweigh the evidence presented at trial." Johnson v.State, 555 So.2d 818, 820 (Ala.Cr.App. 1989).
 III
The appellant contends that the trial court erroneously instructed the jury on intoxication. The pertinent portion of the trial court's jury charge is as follows:
 "[W]ith respect to what effect on a defendant's guilt of a particular charge intoxication may have, I am going to give you these legal principles. Intoxication of a defendant, whether voluntary or involuntary intoxication, may be considered by a jury whenever it is relevant to negate an element of the offense charged such as intent. That is to say, you can consider intoxication if it would be relevant in making your determination of whether or not the intoxication was of such a degree and such an extent that it might have negated or prevented the defendant from formulating or entertaining the particular intent that the law says is an element of the offense.
 "In that regard I am simply going to remind you that you have got certain intents that I gave you as elements of the offenses. First, going backwards in the order that we just left them, assault in the third degree in order to be committed must have been with the intent to cause physical harm. So, there is an intent the law says is required to be proven as an element of that particular offense. And with respect to the offense of attempted rape in the first degree, one of the elements the law requires to be proven for that offense to be established is that the defendant with the intent to commit the offense of rape in the first degree did certain overt acts. So, as to intent in those two instances being a mental condition or mental process, the law says the following: In order for intoxication to be such that it could satisfy you that it prevented the defendant from forming, mentally entertaining, the intent which the law says he must have held, then that intoxication must be of such character and extent as to render him incapable of consciousness that he is committing a crime. Mere drunkenness voluntarily produced is not a defense to a criminal charge and will not prevent a finding of guilt of an offense or reduce the grade of an offense unless it is so extreme as to render impossible some mental condition which is an essential element of the criminal act. Intoxication must be so excessive as to paralyze the mental facilities and render the accused incapable of forming or entertaining the intent required by law as an element of the offense. The degree of intoxication necessary to negate specific intent and thus prevent the intent element of an offense from being proved must amount to insanity. The degree of intoxication required to establish that a defendant was incapable of forming an intent to rape or an intent to cause physical injury is a degree so extreme as to render it impossible for the defendant to form those intents."
R. 403-05. At the close of the jury instructions, defense counsel objected "for the record" to that "part of the charge dealing with intoxication which indicates that it must amount to insanity with not giving a definition of mental defect or diminished capacity or insanity or any of that." R. 417. Defense counsel also stated, however, that he "did not have an alternative charge to suggest." Id.
Initially, we note that the intoxication charge given in this case is similar to the charge upheld by the Alabama Supreme Court in Ex parte Bankhead, 585 So.2d 112, 120-21
(Ala. 1991). The Supreme Court's previous implicit approval of a similar charge is an indicator that the charge in the present case was not erroneous. Cf. Ex parte Harrell,470 So.2d 1309, 1314 (Ala.), cert. denied, 474 U.S. 935,106 S.Ct. 269, 88 L.Ed.2d 276 *Page 1313 
(1985) (Supreme Court declined to find plain error in capital case partially on basis that "trial court's instruction follow[ed] the pattern jury instruction 'recommended' by [the Supreme] Court"). Furthermore, while the trial court did not define "mental defect,"[5] the charge when read as a whole, as we are required to read it, see, e.g., Alexander v.State, 601 So.2d 1130, 1133 (Ala.Cr.App. 1992); Adamsv. State, 587 So.2d 1265, 1269 (Ala.Cr.App. 1991), clearly defined for the jury the degree of intoxication that would amount to "insanity" and that is necessary to negate intent.
Section 13A-3-1(a), Ala. Code 1975, provides, in pertinent part: "It is an affirmative defense to a prosecution for any crime that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts." The effect of insanity — that the defendant "was unable to appreciate the nature and quality or wrongfulness of his acts" — was clearly conveyed to the jury by the court's instruction that, in order to negate intent, the "intoxication must be of such character and extent as to render [the defendant] incapableof consciousness that he is committing a crime." R. 405 (emphasis added). The trial court also twice emphasized that the appellant's intoxication must have been so excessive and extreme that the appellant was unable to form the requisite intent. We find no error in this charge.
 IV
The appellant asserts that his trial counsel was ineffective. The specific acts and omissions complained of are: (1) trial counsel's failure to object "to the defective indictment" and his failure to object to the State's "amend[ing] the indictment at trial"; (2) trial counsel's failure "to provide the court with any requested jury instructions" regarding intoxication; (3) trial counsel's "failure to establish on the record the anticipated testimony of an unavailable witness" in connection with a request for a continuance; and (4) trial counsel's failure to advise him that he could earn incentive good time on "the 15-year offer made to him by the State." Appellant's brief at 18-20. The first three allegations were presented to the trial court in a written motion for a new trial filed under the procedure set forth in Ex parte Jackson,598 So.2d 895, 897-98 (Ala. 1992). The fourth allegation was raised orally at the hearing on this motion. The trial court declined to consider the fourth allegation because it was not included in the written motion.
 "In order to prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). 'In determining whether a defendant has established his burden of showing that his counsel was ineffective, we are not required to address both considerations of the Strickland v. Washington test if the defendant makes an insufficient showing on one of the prongs.' Thomas v. State, 511 So.2d 248, 255 (Ala.Cr.App. 1987)."
Kinsey v. State, 545 So.2d 200, 202 (Ala.Cr.App. 1989) (emphasis in original). Accord Project, Twenty-SecondAnnual Review of Criminal Procedure: United States SupremeCourt and Courts of Appeals 1991-1992, 81 Geo.L.J. 853, 1281-82 (1993).
 A
We determined in Part I of this opinion that, while facially inconsistent, the indictment against the appellant is not fatally defective and that the indictment was not amended. Consequently, trial counsel's failure to object on these grounds did not in any *Page 1314 
manner prejudice the appellant. See Lundy v. State,568 So.2d 399, 402 (Ala.Cr.App. 1990); Smith v. State,446 So.2d 68, 72-73 (Ala.Cr.App. 1984).
 B
In Part III of this opinion, we held that the trial court sufficiently instructed the jury on the degree of intoxication necessary to negate intent. Therefore, there was no prejudice to the appellant from trial counsel's failure "to provide the court with any requested jury instructions" regarding intoxication. Cf. Benson v. State, 602 So.2d 505, 509
(Ala.Cr.App. 1992) (counsel not ineffective for failing to object to jury instruction that was not erroneous).
 C
When the jury was excused for the evening on the first day of the trial, the following occurred:
 "MR. SMITH [defense counsel]: We did want the record to reflect that we earlier made the motion to continue because of the witness problem and that the Court had denied the motion so it would be on the record.
 "THE COURT: Those details are not reflected in the record. If at a later point you wish to put on the record the circumstances of their unavailability, what their testimony might be as expected by the defense and so forth, I will be happy to allow you that opportunity; but I will acknowledge that in chambers, but not on the record, we had discussions at the threshold of the case about the unavailability to the defendant of two witnesses. I gave my ruling after analyzing all the pros and cons of the circumstances denying the request for continuance, but I indicated I will afford the defense the opportunity to make a proffer to the jury or a stipulation."
R. 100. Despite the trial court's offer to allow defense counsel to place further information in the record, the matter of the alleged unavailable witnesses was not raised again during the appellant's trial.
At the hearing on his motion for a new trial, the appellant testified that the missing witnesses were Phillip Cronan and James Watts. R. 441. As noted in Part II of this opinion, the parties stipulated to the testimony of Phillip Cronan. Thus, while Cronan's anticipated testimony was not placed on the record in support of the motion for a continuance, itwas presented to the jury as part of the appellant's defense. The appellant was clearly not prejudiced by defense counsel's actions with regard to this witness.
As for the absent James Watts, the appellant stated at the hearing on his motion for new trial, that Watts "didn't want to come testify because he had some warrants on him in Tuscaloosa County." R. 441. In answer to questions posed by the trial court, the appellant stated that he had "heard" that Watts was in Louisiana at the time of trial; that he had not had "any contact or communication with Mr. Watts" to "see if [Watts] could come back to testify for [him]"; and that the last time he had seen Watts prior to his January 1993 trial was "probably in August or September of '92." R. 462-63.
In Arnold v. State, 601 So.2d 145, 156
(Ala.Cr.App. 1992), this Court stated:
 "[A] motion for continuance should be granted where it is made in order to obtain a missing witness or evidence and the following requirements are met:
 " '(1) the expected evidence must be material and competent; (2) there must be a probability that the evidence will be forthcoming if the case is continued; and (3) the moving party must have exercised due diligence to secure the evidence.'
Ex parte Saranthus, 501 So.2d 1256, 1257
(Ala. 1986)."
Ex parte Saranthus, 501 So.2d 1256, 1257
(Ala. 1986)."
(Emphasis added.) We note that on October 30, 1992, the trial court granted the appellant a continuance of more than one month based on the appellant's assertions that James Watts, Robert Cronan, and Phillip Cronan were absent from the state. See C.R. 30, 19-20, *Page 1315 
21.[6] In view of the fact that this continuance actually stretched into well over two months and considering Watts' reluctance to return to Tuscaloosa as well as the appellant's lack of knowledge as to his whereabouts, it does not appear that trial counsel could have in good faith asserted that there was a probability that Watts' testimony would be forthcoming if the case were again continued. Even had trial counsel provided the trial court with Watts' anticipated testimony, the appellant has failed to demonstrate that all of the remaining prongs of the Saranthus test could have been met. He has therefore failed to demonstrate that he was prejudiced by trial counsel's failure to make a proffer of Watts' anticipated testimony. See Williams v. State, 565 So.2d 302
(Ala.Cr.App. 1990); Smith v. State, 564 So.2d 1053,1054 (Ala.Cr.App. 1990).
 D
As indicated above, appellate counsel followed the procedure set forth in Ex parte Jackson, 598 So.2d at 897-98, and obtained the trial transcript prior to filing a motion for a new trial. The written motion for a new trial was filed on August 15, 1993, and set forth eight specific allegations of ineffective assistance of trial counsel. C.R. 2-3 (Motion for New Trial). The allegation that trial counsel failed to correctly advise the appellant as to the application of good time to an offer that he says was made to him by the State was not included in this motion. Instead, this allegation was raised orally at the hearing on the motion, which was held September 21, 1993.
The trial court stated at the hearing that it would not consider that allegation or any others that had not been set forth in the written motion. The judge explained his actions as follows:
 "Obviously, if I had known that we had a charge that the defense counsel was ineffective with respect to something that was not going to show up on the record, we might have had the defense counsel here. All the items recited in the motion for new trial relate to things that are contained in the record or stated in the record, and therefore, we didn't need to have Mr. Smith [defense counsel] here. I did not on my own undertake to have him here. So, I am going to disallow any consideration of this contention he now makes for the first time here that there was this discussion with Mr. Smith simply because we don't have Mr. Smith here available to testify as a witness." R. 447-48.
In denying the motion at the close of the hearing, the trial court again referred to this matter:
 "[H]is description of Mr. Smith having wrongly advised him concerning the possibility of good time credit being afforded with respect to the offered fifteen year plea, I just disallow . . . because [it is] not in any way alluded to or foreshadowed by the motion for new trial grounds which are quite detailed, and we, therefore, had no way of being alerted to the fact that we might need to have Mr. Smith here to try to find out his side of that discussion." R. 467.
It is well settled that a motion for a new trial is "addressed to the sound discretion of the trial court and [his decision thereon] will not be revised on appeal unless it clearly appears that the discretion has been abused."Nichols v. State, 267 Ala. 217, 228, 100 So.2d 750,760-61 (1958). Accord, e.g., Ashley v. State,606 So.2d 187, 191 (Ala.Cr.App. 1992); Maddox v. State,520 So.2d 143, 154 (Ala.Cr.App. 1986). This principle, of necessity, must grant to the trial court the discretion to decide whether it will consider grounds at a hearing on a motion for a new trial that were not set forth in that motion. We observe that Rule 24.1, A.R.Crim.P., which governs motions for new trial, clearly contemplates the filing of a written motion. See Form 90 (entitled "Motion For New Trial"); Rule 24.3 (motion need not be presented to judge in order to perfect filing). Indeed, Justice Maddox has stated that "a motion for a new trialmust be in writing." *Page 1316 
H. Maddox, Alabama Rules of Criminal Procedure § 24.1 at 636 (1990) (emphasis added).
In this case, a written motion for a new trial was filed on August 15, 1993. This motion did not contain the allegation that trial counsel provided erroneous information concerning good time incentive credit. On August 19, only four days after the motion was filed, the motion was set for hearing on September 20, 1993. C.R. 4, 17 (Motion for New Trial). The motion for a new trial was not amended at any time between August 19 and September 20 to add the allegation of good time misinformation. The trial judge essentially stated that he had not received notice that this particular allegation was being raised and that he was therefore not in a position to address the allegation. Under the circumstances presented, we find no abuse of the trial court's discretion in declining to consider this allegation.
The prejudice prong of the Strickland test "requires a showing that a different outcome of the trial probably would have resulted but for counsel's allegedly ineffective performance." Ex parte Lawley, 512 So.2d 1370, 1372
(Ala. 1987). The appellant has clearly failed to make that showing with regard to his first three allegations. Consequently, he is not entitled to prevail on his ineffective assistance of counsel claims.
For the reasons stated above, the judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur. *Page 1317 
 EXHIBIT 1
SID No. 918486 CASE No. G.J. No. 1733
 A TRUE BILL, presented to the Judge Presiding in open Court by the Foreman of the Grand Jury, in the presence of ___ other Grand Jurors, and FILED in open Court this date.
_______________________ ______________________ _____________ Grand Jury Foreman Clerk Date
---------------------------------------------------------------
 THE STATE OF ALABAMA vs.
CURTIS WAYNE WESSON, alias CURTIS W. WESSON, alias CURTIS WESSON, alias WAYNE WESSON
Defendant
CHARGES:
1. ATTEMPTED RAPE, FIRST DEGREE
No Prosecutor
 It is ordered and adjudged by the Court that bail be fixed at $ __________ Done this __________.
 ________________________________ Judge Presiding
--------------------------------------------------------------
THE STATE OF ALABAMA CIRCUIT COURT TUSCALOOSA COUNTY January Term, 1989
COUNT I
 The Grand Jury of said County charge that before the finding of this Indictment, CURTIS WAYNE WESSON, alias CURTIS W. WESSON, alias CURTIS WESSON, alias WAYNE WESSON, whose name is otherwise unknown to the Grand Jury, a male, did engage in sexual intercourse with a female, to-wit: [the victim], by forcible compulsion, in violation of Section 13A-6-61 of the Code of Alabama.
AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA CHARLES FREEMAN District Attorney Sixth Judicial Circuit --------------------------------------------------------------
[1] A copy of the indictment is attached to this opinion as Exhibit 1.
[2] According to the victim, the instant offense occurred in the early morning hours of April 16, 1989. Her statements to hospital personnel and to the police given on that date made it clear that she complained of an attempted rape, rather than a rape. (We note that trial counsel's vigorous cross-examination of the victim regarding these statements demonstrates that he was readily familiar with those statements.) On April 18, 1989, a warrant was issued for the appellant's arrest for the offense of attempted rape. See C.R. 4. The affidavit supporting this warrant alleged that the appellant, "with the intent to commit the crime of rape 1st degree (13A-6-61(a)(2)) of [the victim], attempt[ed] tocommit said offense by attempting to take her clothes off and hitting her in violation of 13A-4-2 of the Code of Alabama." (Emphasis added.)
On September 19, 1989, the appellant pleaded guilty and was convicted of attempted rape under this same indictment. This conviction was ultimately reversed on appeal. Wesson v.State, 594 So.2d 233 (Ala.Cr.App. 1991). While the record of the appeal of the guilty plea conviction "is not a part of the record in the present appeal, this Court may take judicial notice of its own records in this situation." Hull v.State, 607 So.2d 369, 371 n. 1 (Ala.Cr.App. 1992). The record in the guilty plea appeal contains an affidavit of indigency signed by the appellant on August 14, 1989. That affidavit describes the "charge/ type of proceeding" as "Attempted Rape First Degree." C.R. 16 (CR 90-763). A minute entry dated August 16, 1989, on the case action summary contained in that record recites that "the defendant knowingly and voluntarily waives arraignment and enters a plea of not guilty upon the indictment herein charging him with 1.Attempted Rape, First Degree." C.R. 23 (CR 90763) (emphasis added). The minute entry for the taking of the guilty plea also recites that the indictment charged the appellant "with 1. Attempted Rape First Degree." Id.
[3] In fact, in reversing the appellant's guilty plea conviction, this Court stated: "The appellant, Curtis Wayne Wesson, was indicted for the offense of rape in the firstdegree." Wesson v. State, 594 So.2d at 233 (emphasis added).
[4] In the context of another rule, the appellant contends that the Alabama Rules of Criminal Procedure do not apply to his case because he was indicted in May 1989, when the Temporary Rules of Criminal Procedure were in effect. As originally adopted, the permanent rules applied only to "criminal proceedings commenced at or after 12:01 a.m., January 1, 1991." Former Rule 1.5, A.R.Crim.P. However, effective April 21, 1992, Rule 1.5 was amended to provide that the permanent rules "govern all criminal proceedings, without regard to when the proceeding was commenced." Consequently, as of April 21, 1992, the permanent rules became applicable to the proceedings in the appellant's case, including his trial, which took place in January 1993. Moreover, permanent Rule 13.2(c) is identical to Temporary Rule 15.2(c).
[5] We note that the current pattern jury instructions define "mental disease or defect" only in the negative: " 'Mental disease or defect' does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct. " Alabama Pattern Jury Instructions — Criminal D-45 (ABICLE 1989 rev.). See also Ala. Code 1975, § 13A-3-1(b).
"[D]iminished capacity is not recognized as a defense in Alabama," Neelley v. State, 494 So.2d 669, 682
(Ala.Cr.App. 1985), affirmed, 494 So.2d 697 (Ala. 1986), cert. denied, 480 U.S. 926, 107 S.Ct. 1389, 94 L.Ed.2d 702 (1987), and thus was properly not defined by the trial court.
[6] According to the written motion for continuance, these witnesses were then "working and residing in the State of Louisiana." C.R. 21. *Page 1318